NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 2, 2013
Decided February 5, 2014

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 12-1522

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 1:10-cr-00163-WCG-2 |
| BERNABE NUNEZ-GUZMAN, *Defendant-Appellant.* | William C. Griesbach, *Judge.* |

**O R D E R**

A jury convicted Bernabe Nunez-Guzman on three of eight counts of a second superseding indictment charging him and nine others with participating in the large-scale cultivation of marijuana near Green Bay, Wisconsin. The district court ordered him to serve 136 months in prison, a term well below the low end of the range suggested by the Sentencing Guidelines. Nunez-Guzman appeals both his conviction and sentence. He contends that the court should have suppressed the identification of one of the witnesses who named him as a participant in the marijuana operation, on the ground that the identification was the product of improperly suggestive questioning and display of his photograph to the witness by a law enforcement officer. He also contends that the district court committed procedural error in sentencing him, in that the court held him accountable

for conduct underlying charges on which the jury had acquitted him, and further that the court did not adequately consider several of his arguments in mitigation. Because none of these arguments has merit, we affirm Nunez-Guzman's conviction and sentence.

## I.

Our summary of the facts may be brief. The conspirators in this case were charged with cultivating thousands of marijuana plants at multiple sites in northeastern Wisconsin during the spring and summer of 2010. Adopting a practice popularized by Mexican drug cartels, the conspiracy grew much of the marijuana on plots secreted within federal lands, including the Chequamegon-Nicolet National Forest and the nearby Menominee Indian Reservation. Raul Juvenal Avila-Rodriguez ("Raul Avila") ran the cultivation operation from a residence in Seymour, Wisconsin, a small town roughly fifteen miles from the city of Green Bay. The residence—a converted cheese factory— was used to dry and process marijuana plants that had been harvested from the grow sites. Law enforcement agents raided the property in August 2010 and immediately saw that it was being used to prepare large quantities of marijuana for distribution. They arrested Raul Avila and eight undocumented Mexican nationals who were assisting him with the operation.

Nunez-Guzman owned the Seymour residence; in addition, a 1994 blue pick-up truck that had been used by the conspirators was titled to his business. At trial, Nunez-Guzman testified that he was simply an unwitting, innocent landlord who had leased the residence and truck to people he had no idea were putting them to illegal use. Two witnesses, however, tied him directly to the conspiracy. Jose Louis Sandoval-Mendoza ("Sandoval") and Javier Navarro-Zarragoza ("Navarro"), were among the eight men arrested at the Seymour residence along with Raul Avila; and both testified on the government's behalf at trial. They knew Nunez-Guzman by the nickname "Green Bay," identified him at trial, and indicated that he assisted Raul Avila with the management of the marijuana operation. Sandoval testified that when he and three other men flew from California to the city of Green Bay in April 2010 to work for the marijuana operation, Raul Avila and Nunez-Guzman met them at the airport; Nunez-Guzman then drove Sandoval to the Seymour residence. The ride took 20 to 25 minutes. Navarro testified that Nunez-Guzman had driven him between one of the grow sites and the Seymour residence on at least two occasions, and had also delivered food to the grow site at which he was working on two occasions. In addition to this testimony, there was other evidence linking Nunez-Guzman to the conspiracy: He not only provided the pickup truck but kept it in repair and provided a loaner when the pickup was undergoing repair; his business wrote checks payable to Raul Avila; he purchased several saws (including a pruning saw) and 27 seed

starter trays that were used by the conspirators; he and Raul Avila drove field workers to one of the cultivation sites for harvesting on August 5, 2010 (five days prior to the raid of the Seymour house); he purchased an AK-47 style assault rifle that was found in the raid on the Seymour residence; phone records reflected over 600 calls between Raul Avila's and Nunez-Guzman's phones during the summer of 2010; Nunez-Guzman conceded that he had telephonic contact with Raul Avila and two other individuals associated with the Seymour residence, including five hours of calls with Raul Avila during May 2010; and five of the cell phones seized from the Seymour residence in August 2010 included Nunez-Guzman's telephone number in the list of contacts, several of those identifying the number by the name "Grin Vey," which of course in Spanish sounds like "Green Bay."

## II.

### A.

Before trial, Nunez-Guzman unsuccessfully sought to suppress evidence that Sandoval had, during post-arrest questioning, identified a photograph of him as "Green Bay," and also to preclude any such in-court identification of Nunez-Guzman by Sandoval. Nunez-Guzman argued that the out-of-court identification was the product of impermissible suggestion by the agent who questioned him, in that the agent essentially conducted a "show-up" by presenting Sandoval with a driver's license photograph of Nunez-Guzman. *See* R. 45-1. After conducting an evidentiary hearing on Nunez-Guzman's motion, at which a video recording of the interview of Sandoval was played, the district court (Hon. William C. Griesbach) declined to suppress the identification. The court noted that this was "very unusual and not like the typical identification motion," R. 315 at 46, in which a victim or witness who had only a brief opportunity to observe the perpetrator of a crime is asked to view a lineup or photograph array and indicate whether the authorities have identified the correct suspect, *id.* at 46-47. Instead, in the course of questioning Sandoval at length about the marijuana operation, the agent had shown him pictures of various men and asked whether Sandoval recognized them. Sandoval himself had taken part in the marijuana operation and had worked on a daily basis with most of the persons whose pictures he was shown. *Id.* at 47. Given Sandoval's familiarity with the scheme and its participants, the agent interviewing him about the scheme could expect that Sandoval would be able to readily identify his criminal cohorts from photographs without the sort of difficulty that a victim or bystander might have. So the court did not find it remarkable that the agent would show Sandoval a series of photographs and ask him whether or not he could identify the individuals depicted. *Id.* When the agent showed Sandoval the driver's license photo of Nunez-Guzman, Sandoval had, with confidence, identified it as

a photograph of the man he knew as "Green Bay." *Id.* at 48. The court found that the agent had in no way suggested that Sandoval should recognize the photo as one of Nunez-Guzman or otherwise prompted the identification. *Id.* at 47-48. The court also rejected the contention that a discussion of Nunez-Guzman between the agent and Sandoval just prior to the identification had somehow influenced the latter. *Id.* Nor was the court concerned by the fact that the photograph of Nunez-Guzman differed from the other photos that Sandoval was shown in the sense that it was a department of motor vehicles ("DMV") photograph rather than a mug shot. *Id.* at 48. "He [the agent] is trying to figure out who is involved in the operation and given the manner in which this [interview] is conducted, I do not see any suggestiveness." *Id.* Finally, the court noted that Sandoval had a basis to identify Nunez-Guzman that was entirely independent of the interview and the photograph he was shown: Sandoval had spent between 15 and 30 minutes in a car with Nunez-Guzman when he had driven Sandoval from the Green Bay airport to the Seymour residence, which had provided Sandoval with a significant, non-stressful opportunity to observe the defendant. *Id.* at 49.

We review the district court's decision to deny the motion to suppress de novo, granting appropriate deference to any factual findings underlying its ruling. *See United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009).

The district court correctly denied the motion to suppress Sandoval's identification of Nunez-Guzman. The first and key question in this case, as both parties agree, is whether the agent who questioned Sandoval did anything to suggest that the photograph he showed to Sandoval was one of Nunez-Guzman. *See Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012); *Neil v. Biggers*, 409 U.S. 188, 196, 198, 93 S. Ct. 375, 380, 381-82 (1972); *Simmons v. United States*, 390 U.S. 377, 383-84, 88 S. Ct. 967, 971 (1968); *United States v. Sanders*, 708 F.3d 976, 983 (7th Cir. 2013), *cert. denied*, 2013 WL 5949907 (U.S. Dec. 9, 2013). For the following reasons, he did not.

The agent showed Sandoval a series of photographs, which included photos of Nunez-Guzman along with other co-conspirators (including one of Sandoval himself), and asked Sandoval to identify anyone he knew. Some of the photographs Sandoval recognized; others he did not. Sandoval was an active participant in the charged conspiracy who had some familiarity with Nunez-Guzman and the other participants, so there was nothing out of the ordinary or suspect about this approach.

The photograph of Nunez-Guzman was different from the others in the sense that it was a DMV photograph (although, according to the agent, it was folded and thus not

identifiable as such when shown to Sandoval) rather than a jailhouse mug shot, but we cannot see how the difference was prejudicial to Nunez-Guzman. Sandoval was not shown a photographic array, in which such a difference might be the springboard to argue that the witness was being steered to pick a particular photograph. *See Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) ("The danger to be avoided in identification procedures is that of *orchestrating* the procedure so that one particular suspect stands out from the others and the procedure implicitly suggests to the witness that 'this is the man.'") (emphasis in original) (citing *Foster v. California*, 394 U.S. 440, 442-43, 89 S. Ct. 1127, 1128-29 (1969)); *see also United States v. Wade*, 388 U.S. 218, 232-33, 87 S. Ct. 1926, 1935-36 (1967) (identifying examples of suggestive lineups and other in-person identification procedures); *Simmons*, 390 U.S. at 383-84, 88 S. Ct. at 971 (discussing parallel dangers of suggestive use of photographs). Moreover, even if Sandoval saw or surmised that the photograph was a driver's license photo (as opposed to the jailhouse booking photographs he was otherwise shown), to our mind this would only have made it less likely that he would have inferred something culpable from the nature of Nunez-Guzman's picture.

Apart from the nature of the photograph, there is no evidence suggesting that the agent who interviewed Sandoval in any way influenced the indentification. He did not, for example, show Sandoval the photograph and ask, "Is this Green Bay?" (Indeed, the agent testified that he did not even know, prior to Sandoval's identification, that "Green Bay" was the individual depicted in the photograph.)

Nunez-Guzman suggests that the district judge found or implied that Sandoval said "This is Green Bay," *before* the agent showed Sandoval the photograph of Nunez-Guzman. But this is a misreading of both the judge's remarks and the evidence. The video recording indicates that the identification came after the agent placed the photograph of Nunez-Guzman on the table in front of Sandoval. R. 149-1 at 11; Gov. Ex. 4. The judge did not indicate otherwise. The confusion appears to arise from the following remark by the judge: "The depiction in the video is, 'Here is Green Bay' I think before the photo is brought out from behind the witness." R. 315 at 48. A review of both the recording and the transcript makes clear that what the judge meant by this remark is that because the agent's back was to the camera, a viewer of the video cannot see the photograph shown to Sandoval until Sandoval has said, "Here is Green Bay," and the agent then removes the photograph from the table between the agent and Sandoval and places it to the side. In other words, when the judge said that the photograph was "brought out from behind the witness," he was speaking from the viewer's perspective; what he intended to convey was that the agent took the photograph from in *front* of himself (between himself and Sandoval). The specific point that the judge was making was that because the photo was on the table in front of the

agent when he showed it to Sandoval, the photo is not visible to the viewer of the video and therefore one cannot see whether the agent had folded the DMV print-out so that only the photograph was visible to Sandoval, as the agent had testified. R. 315 at 48. But there is no dispute at this juncture that the photo was, in fact, folded.

As Nunez-Guzman points out, the agent and Sandoval had spent time discussing "Green Bay" and his role in the conspiracy just before the photograph of Nunez-Guzman was presented to Sandoval. But there is nothing which suggests that this discussion somehow influenced Sandoval's identification. Rather than indicating to Sandoval or asking him whether the photograph was one of "Green Bay," the agent instead said to Sandoval, "Okay, I already have so many photos. All right, I want you to see these people to see if you recognize them, O.K.?" R. 149-1 at 11. At that point, he placed the photograph of Nunez-Guzman in front of Sandoval, and Sandoval said, "Here is 'Green Bay.'" *Id.*

Finally, as Judge Griesbach noted, Sandoval's exposure to Nunez-Guzman during the ride from the Green Bay airport gave him a basis independent of whatever occurred during the interview to identify Nunez-Guzman. *See Perry*, 132 S. Ct. at 720, 724-25. Indeed, Sandoval gave the agent a general description of Nunez-Guzman's height, weight, and build which the parties agree was accurate. R. 149-1 at 12. And Sandoval expressed "100 percent" confidence in his identification, as the district judge noted. *Id.* at 11. On this record, there is no reason to believe that Sandoval's identification of the photograph was the product of anything other than his independent observation of and familiarity with Nunez-Guzman. *See Biggers*, 409 U.S. at 199-200, 93 S. Ct. at 382.

## B.

We move on to the sentence. In determining the offense level, the district court held Nunez-Guzman responsible for the full amount of marijuana involved in the charged conspiracy, notwithstanding his acquittal on some of the substantive marijuana charges. *See* U.S.S.G. § 1B1.3(a)(1)(B) & (a)(2); § 2D1.1(c) & comment. (n.12) (Nov. 2011).[1] Among other enhancements, the court also increased the offense level by two levels pursuant to section 2D1.1(b)(1), based on its finding that Nunez-Guzman purchased an AK-47 style assault rifle from an acquaintance and gave it to Raul Avila when the marijuana that the conspirators were cultivating was ready for harvesting. That firearm was among several that were found in the Seymour residence. The district court imposed this enhancement

---

[1] Nunez-Guzman was sentenced pursuant to the November 2011 version of the Sentencing Guidelines, and therefore all of our cites are to that version.

despite Nunez-Guzman's acquittal on Count Seven of the second superseding indictment, which charged him with transfer of this gun for use in a drug-trafficking offense, *see* 18 U.S.C. § 924(h), and also on Count Six, which charged him with the possession of that gun and two others during a drug trafficking offense, *see* 18 U.S.C. § 924(c)(1)(A)(i). R. 151 at 6-7; R. 247 at 4. The resulting total offense level of 38, coupled with a criminal history category of I, produced an advisory sentencing range of 235 to 293 months. Both parties and the court agreed that a sentence within that range was too high. The court ultimately imposed a sentence of 136 months, some 99 months (more than eight years) below the low end of the Guidelines range.

Nunez-Guzman contends that the district court committed two types of procedural error in arriving at his sentence. First, he contends that, in view of his acquittals on some of the substantive marijuana counts and both of the firearms charges, the court was mistaken to consider as relevant conduct both the total amount of marijuana involved in the conspiracy as well as the AK-47 that the court found he supplied to Raul Avila. Second, he maintains that the court, in determining a sentence that was reasonable in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), did not give adequate consideration to his acquittals, to his likely deportation as a result of his convictions, and to the many letters of support sent to the court by community members. Whether the court committed a procedural error of the types identified by Nunez-Guzman presents a question of law that we review *de novo*. *E.g.*, *United States v. Lyons*, 733 F.3d 777, 784 (7th Cir. 2013).

The court properly held Nunez-Guzman to account for the total amount of marijuana involved in the conspiracy. Pursuant to the relevant conduct guideline, when a defendant has engaged in criminal activity jointly undertaken with others, he is responsible at sentencing for the reasonably foreseeable acts of his cohorts in furtherance of the joint undertaking as well as his own acts. U.S.S.G. § 1B1.3(a)(1)(B) & (a)(2); *id.* comment. (nn. 2(a)(1), (c)(3), (c)(8), & 3). Thus, when a defendant has participated in a narcotics conspiracy, he is responsible for the total quantity of narcotics involved in the conspiracy that was reasonably foreseeable to him. *See United States v. Stadfeld*, 689 F.3d 705, 713-14 & n.2 (7th Cir. 2012); § 2D1.1, comment. (n.12). In this case, all of the marijuana for which Nunez-Guzman was held responsible was cultivated pursuant to the charged conspiracy, of which he was convicted, and there is no dispute as to what the total was. The jury's decision to acquit Nunez-Guzman on some of the substantive counts of the indictment charging him with the cultivation of marijuana at various grow sites is immaterial in this respect, as the amounts of marijuana underlying those counts still qualify as conduct that is relevant to the conspiracy conviction and may therefore be considered at sentencing, notwithstanding the acquittals, so long as those amounts are established by

a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156-57, 117 S. Ct. 633, 637-38 (1997) (per curiam); *United States v. Redmond*, 667 F.3d 863, 875 (7th Cir. 2012); *United States v. Kokenis*, 662 F.3d 919, 931 (7th Cir. 2011); *United States v. Waltower*, 643 F.3d 572, 577-78 (7th Cir. 2011). We add that in addition to the conspiracy charge, Nunez-Guzman was convicted on a charge relating to one of the grow sites as well as the charge that he maintained a drug distribution facility (the Seymour residence). R. 247 at 3, 4. So the convictions confirm that Nunez-Guzman was familiar with the scope and operation of the marijuana conspiracy, such that the total quantity of marijuana cultivated pursuant to the conspiracy was reasonably foreseeable to him.

Likewise the court did not err in applying the gun enhancement based on Nunez-Guzman's provision of the AK-47 to his co-conspirators. Although the jury had acquitted him of the two firearms charges, it is settled, as the cases we have just cited establish, that such an acquittal does not preclude the court at sentencing from considering the same conduct, so long as the court finds by a preponderance of the evidence that the conduct occurred. In this case, the court found by a preponderance that Nunez-Guzman had obtained an AK-47 and supplied it to his co-conspirators. R. 317 at 9, 31-32. Regardless of whether he had been charged with or acquitted of that act, it remained conduct that was relevant to his counts of conviction and which the Guidelines expressly directed the court to consider in ascertaining the offense level. § 2D1.1(b)(1).

Finally, apart from the calculation of the offense level, the court committed no procedural error in weighing the statutory sentencing factors that bear on a reasonable sentence. The court did, in fact, consider the jury's decision to acquit Nunez-Guzman on the firearms charges and certain of the substantive marijuana counts. R. 317 at 7-8, 26-27. However, the court believed that these acquittals were more likely the result of jury compromise and lenity rather than a reliable indicator that Nunez-Guzman was factually innocent of the charges. *Id.* at 26-27. Having presided over the trial and being far more familiar with the evidence than we are, we cannot fault the court for its conclusion. In any case, the pertinent point for our purposes is that the court did explicitly address the acquittals. Similarly, the court did acknowledge and take into account the likelihood that Nunez-Guzman's convictions would likely lead to his deportation from the United States. *Id.* at 35. The court also acknowledged, discussed, and considered the strongly supportive letters it had received from members of Nunez-Guzman's church and community. *Id.* at 26, 36.

The court's decision to impose a term of imprisonment that was barely more than half of the minimum sentence advised by the Guidelines leaves us with no doubt that the

court did, in fact, weigh the mitigating factors that Nunez-Guzman has emphasized. The sentence was 16 months higher than the 120-month term (the statutory minimum) advocated by defense counsel, but relative to the Guidelines range it was a substantially reduced sentence nonetheless. In selecting that sentence, Judge Griesbach reasoned that a term somewhat above the statutory minimum was warranted given that Nunez-Guzman continued to deny responsibility (and therefore to express no remorse) for his offenses. R. 317 at 34. There has been no contention, nor do we discern any basis for one, that the sentence imposed was substantively unreasonable. *See United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005).

**III.**

For the reasons set forth above, we AFFIRM the conviction and sentence.