# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2195

_____

United States of America

*Plaintiff - Appellee*

v.

Mahamud Said Omar, also known as Mohamud Said Omar, also known as Sharif Omar

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: January 14, 2015
Filed: May 27, 2015

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

After a jury trial, Mahamud Said Omar was convicted of several terrorism-related offenses. The district court[1] sentenced him to a total term of 240 months in prison. Omar appeals, and we affirm.

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

## I. Background

On August 20, 2009, a federal grand jury indicted Omar for (1) conspiracy to provide material support to terrorists, 18 U.S.C. § 2339A(a); (2) providing material support to terrorists, *id.*; (3) conspiracy to provide material support to a designated foreign terrorist organization, 18 U.S.C. § 2339B(a)(1); (4) providing material support to a designated foreign terrorist organization, *id.*; and (5) conspiracy to murder, kidnap, and maim persons outside of the United States, 18 U.S.C. § 956(a)(1).

Before trial, Omar moved to suppress any identification evidence, claiming that the pre-trial identification procedure by which witnesses identified him was constitutionally flawed. A magistrate judge held a hearing on this motion and heard the following evidence about three witnesses' pre-trial identifications of Omar.

Before trial, Kamal Hassan identified Omar three times. On April 9, 2009, an FBI agent showed Hassan eighty-five photographs one at a time. After displaying each photograph, the agent asked Hassan whether he knew the person in the picture. If Hassan said yes, the agent asked Hassan to describe what he knew about the person. Omar's picture was the eighty-third photograph shown to Hassan. Hassan identified Omar as "Sharif." According to the agent, Hassan made this identification without hesitation. Hassan stated that he recognized Omar from a mosque and that Omar later spent time at an al Shabaab safe house in Somalia. Omar's photograph remained on the table for a couple of minutes while the agent and Hassan discussed Omar. Hassan identified Omar again on June 7, 2010. This time, an FBI agent showed Hassan twenty-nine photographs, following the same procedure as before. When the agent displayed Omar's picture and asked whether Hassan knew the person in the picture, Hassan identified Omar as "Sharif." The agent testified that Hassan made this identification without hesitation. Omar's picture remained on the table for two or three minutes while Hassan discussed Omar. During a third interview with an FBI agent on November 15, 2011, Hassan mentioned someone named "Sharif." The agent

then displayed Omar's photograph, and Hassan identified Omar as "Sharif" without hesitation.

Abdifatah Isse also identified Omar three times before trial. On February 25, 2009, an FBI agent showed Isse three photographs one at a time. After displaying each picture, the agent asked Isse whether he knew the person in the picture. When Omar's photograph was shown, Isse identified Omar as "Sharif" without hesitation. The agent then asked Isse to describe what he knew about this person. Omar's picture remained in front of Isse for roughly ten minutes while he and the agent discussed Omar. During a second interview on March 11, 2009, Isse mentioned someone named "Sharif" as a person Isse knew from a local mosque who came to a house where he was staying. At this point, an FBI agent showed Isse a photograph of Omar; Isse again identified Omar as "Sharif" without hesitation. Omar's photograph remained in front of Isse for ten or fifteen minutes. An FBI agent interviewed Isse again at a later date. This time, the agent showed Isse twenty photographs one at a time and asked Isse whether he recognized the person in each picture. When Omar's photograph was shown, Isse identified Omar as "Sharif" without hesitation.

Salah Ahmed made one pre-trial identification of Omar. During an interview on July 19, 2009, an FBI agent showed Ahmed 152 photographs one at a time and asked whether he knew the person in each photograph. Omar's picture was approximately the fifteenth one shown. When the agent asked Ahmed whether he recognized the person in the photograph, Ahmed identified Omar as "Sharif" without any doubt.

After hearing this evidence, the magistrate judge recommended that Omar's motion to suppress be granted. The magistrate judge found that the pre-trial identification technique used with Hassan, Isse, and Ahmed was impermissibly suggestive because it amounted to a single-photograph identification. The magistrate judge also concluded that the repeated displays of Omar's picture "served to dispel

any hesitation the witnesses may have had in their original identification[s]." Moreover, because of the "absence of evidence establishing the reliability of these identifications," the magistrate judge reasoned that the identification procedure "g[a]ve rise to a serious likelihood of irreparable misidentification." The district court rejected the magistrate judge's recommendation and denied Omar's motion to suppress. In particular, the court found these witnesses "were sufficiently familiar with the Defendant to provide an accurate identification."

Also before trial, the Government notified Omar that it intended to present evidence that was obtained from electronic surveillance conducted pursuant to the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801 *et seq.* In response, Omar filed a motion requesting disclosure of the FISA materials and suppression of all FISA-derived evidence. The Government then filed a declaration from the Attorney General of the United States averring that "it would harm the national security of the United States to disclose or hold an adversarial hearing with respect to the FISA [m]aterials." Under FISA, this declaration triggered an *in camera*, *ex parte* review of the FISA materials by the district court. 50 U.S.C. § 1806(f). After conducting this review, the district court denied Omar's motion for disclosure and suppression.

During Omar's trial, the jury learned that in the fall of 2007, a group of men in Minnesota developed a plan to travel to Somalia. Hassan, Isse, and Ahmed were invited to join this trip. Isse was told that the purpose of traveling to Somalia was to "[w]age jihad against the Ethiopian invaders." During trial, Hassan, Isse, and Ahmed identified Omar, whom they knew as "Sharif." They testified that they saw Omar at a mosque before they left for Somalia. Hassan also knew Omar from seeing him while they lived in the same apartment complex. In addition, Isse and Ahmed Ali Omar, another individual who planned to go to Somalia, met with Omar at a restaurant in Minnesota. According to Isse, Omar gave Ahmed Ali Omar roughly $500 in cash,

wished him good luck on the trip, and stated, "[I]f you guys need anything, just call me."

Hassan, Isse, and Ahmed went to Somalia in late 2007. They eventually ended up at what Ahmed described as a safe house. This safe house was operated by a woman named Umma Shabaab, which translates to "the mother of the youth." Omar himself later stayed there, a fact confirmed by Ahmed and Isse. Ahmed testified that he shared a room with Omar at the safe house for several days, and Isse talked with Omar a couple of times and went to coffee shops with him. According to Ahmed, only members of al Shabaab could enter the house where they stayed. Omar later admitted to the FBI that he stayed at this house and knew it was operated by al Shabaab. Ahmed testified that Omar told Umma Shabaab that he would give her $1,000 to buy guns. Umma Shabaab confirmed to Ahmed that Omar gave her money for the guns. Omar later told the FBI that he went to Somalia, in part, to join al Shabaab.

Omar eventually returned to Minnesota, where he continued to help others travel from Minnesota to Somalia. Indeed, Omar later described himself to the FBI as an al Shabaab "team leader." In August 2008, Omar went to the airport in Minnesota with two men who were traveling to Somalia. Omar admitted to the FBI that he knew these men were going to Somalia to join al Shabaab. Later in 2008, Omar went with several more men to a travel agency to help them purchase airline tickets to Somalia.

Matthew Bryden, an expert witness, also testified at trial. He explained that the leaders of al Shabaab, which translates to "the youth," intend "to establish their form of Islamic law, of sharia law" as well as "align[] themselves with other foreign jihadist groups," including al Qaeda. On this latter topic, Bryden explained that al Shabaab "has for a long time sought to identify itself with al Qaeda in various forms" and that al Qaeda and Osama bin Laden also have made public statements about al Shabaab.

Bryden also described al Shabaab's use of suicide bombings and improvised explosive devices. In particular, Bryden described a series of five suicide attacks in Somalia on October 29, 2008. Although al Shabaab did not claim responsibility for these attacks, Bryden testified that the type of vehicle used in most of these bombings was "a signature of al Shabaab" and that only al Shabaab had the preexisting network to support these attacks. The Government presented evidence indicating that Shirwa Ahmed, one of the men whom Omar knew from the al Shabaab safe house in Somalia, died in one of these explosions. Indeed, shortly after Shirwa Ahmed died, Omar told Isse that Shirwa Ahmed had died in a "[s]uicide explosion."

The jury found Omar guilty on all five counts. Omar now appeals.

## II.    Discussion

### A.    Identification Evidence

Omar first argues that the identifications of him by Hassan, Isse, and Ahmed during trial violated the Due Process Clause because these identifications resulted from constitutionally flawed pre-trial identifications. We review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Pickar*, 616 F.3d 821, 827 (8th Cir. 2010).

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). In considering such a claim, we initially analyze whether the pre-trial identification procedure was suggestive and unnecessary. *Perry v. New Hampshire*, 132 S. Ct. 716, 723-25 (2012). If it was, we examine whether the identification technique created a "substantial likelihood of misidentification." *Id.* at

724 (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).  In particular, we consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

As detailed above, the initial pre-trial identifications of Omar occurred during interviews in which Hassan, Isse, and Ahmed were shown a series of photographs by FBI agents.  These photographs were shown to them one at a time.  After each photograph was displayed, the agent asked the witness an open-ended question about whether the witness knew the person in the picture.  The agents followed this same procedure when Omar's photograph was shown during the initial interviews.  This identification procedure did not imply that Omar was the person in the picture.  Nor did it impermissibly suggest that Omar had engaged in wrongdoing.  Omar's picture was simply one in a series of photographs about which the witnesses were asked a non-suggestive question.  Such an identification procedure is not impermissibly suggestive. *See United States v. Nunez-Guzman*, 554 F. App'x 507, 511-13 (7th Cir.) (order) (finding that showing a witness a series of photographs and asking him to identify who he knows is not impermissibly suggestive), *cert. denied*, 574 U.S.---, 135 S. Ct. 284 (2014); *United States v. Moore*, 240 F. App'x 699, 705-06 (6th Cir. 2007) (holding that showing a witness photographs and asking him to identify who he recognizes is not impermissibly suggestive); *cf. United States v. Triplett*, 104 F.3d 1074, 1080 (8th Cir. 1997) (finding that an identification technique was not impermissibly suggestive where "[t]he photographs [of six persons with similar characteristics] were handed to [the witness] in a stack, and he was instructed to examine each photograph and to advise the detectives if he recognized either of the individuals he had seen in the alley").

Omar likens the identification procedure used here to a single-photograph display, in which a witness to a crime identifies the defendant as the culprit after

seeing a single photograph of him. We have held that such an identification procedure is impermissibly suggestive. *United States v. Patterson*, 20 F.3d 801, 806 (8th Cir. 1994). The identification procedure used here does not raise a comparable concern about suggestiveness. Although Hassan, Isse, and Ahmed initially identified Omar from a single picture, they saw his photograph as part of a series of photographs. Consequently, unlike a single-photograph display in which an eyewitness is asked to identify a single suspect, Hassan, Isse, and Ahmed were asked whether they could identify between three and 152 individuals during their initial identification interviews. *Cf. Moore*, 240 F. App'x at 706 ("Unlike the typical identification situation in which an eyewitness is asked to identify a single person, [the witness] had dozens of individuals to choose from in identifying the photographs given to him."). Omar's attempt to analogize to an impermissibly suggestive single-photograph display accordingly fails.

Omar also contends that the FBI's actions after Hassan, Isse, and Ahmed made their initial identifications render the procedure impermissibly suggestive. First, Omar notes that his photograph was shown to Hassan and Isse three times and that during Hassan's third interview and Isse's second interview, an FBI agent displayed Omar's picture after they mentioned someone named "Sharif." But by this point, Hassan and Isse already had identified Omar as "Sharif" without hesitation under circumstances that were not unduly suggestive. This sequence of events undermines Omar's contention that the repeated displays of his photograph served to "dispel any hesitation" that Hassan and Isse may have had in their original identifications. *Cf. id.* (noting that showing photographs to a witness "many times[] mak[es] the procedure, to some extent, the functional equivalent of a large photograph array"). Second, without citing any case law, Omar argues that leaving his photograph in front of the witnesses while they discussed "Sharif" was improper. This innocuous act is not impermissibly suggestive, especially because Omar does not assert that the FBI treated his photograph differently from the others that were shown to the witnesses.

Even if it could be said that the identification technique used here was unduly suggestive, we have reasoned that "when someone already familiar with a suspect is asked to comment on whether a recorded voice or image portrays the suspect . . . concerns [about the prejudicial effect of undue suggestiveness] are absent." *United States v. Dobbs*, 449 F.3d 904, 909-10 (8th Cir. 2006) (explaining that the witnesses "were not eyewitnesses being asked to recall their impression of a stranger during a short encounter in the emotionally charged context of an armed robbery"). These circumstances existed here.[2] To begin with, Hassan, Isse, and Ahmed identified Omar before trial without hesitation or doubt. They had seen Omar at a mosque before they left Minnesota. Hassan also knew Omar from living in the same apartment complex as him, and Isse met with Omar at a restaurant in Minnesota. In addition, Ahmed and Isse saw Omar at the safe house in Somalia. Ahmed shared a room there with Omar for several days, and Isse talked with Omar and went to coffee shops with him. Because witnesses who were already familiar with Omar were simply asked an open-ended question about whether they knew him, the identification technique used here did not create a substantial likelihood of misidentification. *See id.*; *Perry*, 132 S. Ct. at 724.

---

[2]Omar argues that we must make our decision about the reliability of the pre-trial identifications based solely upon the pre-trial record. However, "in reviewing the denial of a motion to suppress, we must examine the entire record, not merely the evidence adduced at the suppression hearing." *United States v. Martin*, 982 F.2d 1236, 1240 n.2 (8th Cir. 1993). *Martin* was a Fourth Amendment case, *id.* at 1239, but we apply an analogous rule in a due-process challenge such as this. *See Pickar*, 616 F.3d at 827-28 (considering the totality of the circumstances in making a reliability determination and stating that we will consider the "entire record" to determine whether "we are left with a firm and definite conviction that a mistake has been made" (quoting *United States v. Hines*, 387 F.3d 690, 694 (8th Cir. 2004))); *United States v. Bangert*, 645 F.2d 1297, 1303-04 (8th Cir. 1981) (determining that identifications were reliable, in part, because the witnesses' in-court identifications were made "with certainty").

For these reasons, the district court did not err in denying Omar's motion to suppress Hassan's, Isse's, and Ahmed's identifications of him during trial.

## B.   FISA

Omar also challenges the district court's decisions not to disclose the FISA materials to him and not to suppress the FISA-derived evidence that was admitted at trial.

We begin with the district court's ruling that Omar was not entitled to review the FISA materials.  In FISA, Congress provided that where, as here, the Attorney General certifies under oath that "disclosure [of FISA materials] or an adversary hearing would harm the national security of the United States," a district court should "review in camera and ex parte the [FISA] application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f). While the district court may order the disclosure of FISA materials "under appropriate security procedures and protective orders," the court may do so "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id.*  If the district court "determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure." *Id.* § 1806(g).  With respect to this *in camera*, *ex parte* procedure, we have emphasized that "[d]isclosure and an adversary hearing are the exception occurring *only* when necessary." *United States v. Isa*, 923 F.2d 1300, 1306 (8th Cir. 1991) (quoting *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982)).

The parties disagree about the applicable standard for reviewing the district court's decision not to disclose the FISA materials to Omar.  Omar contends that *de novo* review is appropriate; the Government advocates for abuse-of-discretion review.

-10-

This court has not expressly decided this issue, but our *Isa* decision hinted at its resolution. In *Isa*, we agreed with the district court's ruling that the appellant was not entitled to disclosure of the FISA materials. 923 F.2d at 1306. In so doing, we primarily relied on three out-of-circuit decisions, *id.*, two of which reviewed a district court's disclosure decision under 50 U.S.C. § 1806(f) for abuse of discretion. *United States v. Badia*, 827 F.2d 1458, 1464 (11th Cir. 1987); *Belfield*, 692 F.2d at 146-47. The third decision cited in *Isa* did not expressly address this issue. *United States v. Sarkissian*, 841 F.2d 959, 964-65 (9th Cir. 1988). And since *Isa*, two other circuits have reviewed a district court's disclosure decision under FISA for abuse of discretion. *United States v. El-Mezain*, 664 F.3d 467, 567 (5th Cir. 2011); *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005). Abuse-of-discretion review also accords with our general practice of leaving discovery-related decisions similar to this one to the sound discretion of the trial court. *See, e.g.*, *United States v. Roach*, 28 F.3d 729, 734 (8th Cir. 1994) ("We review the denial of [the defendant's] motion for discovery under Rule 16 for abuse of discretion."). For these reasons, we now make explicit what *Isa* left unsaid: We review a district court's disclosure decision under 50 U.S.C. § 1806(f) for abuse of discretion.

Consistent with our practice in *Isa*, we have studied the FISA materials on our own. *See* 923 F.2d at 1306. Mindful of the directive that "[d]isclosure and an adversary hearing are the exception occurring *only* when necessary," *id.* (quoting *Belfield*, 692 F.2d at 147), we find no abuse of discretion in the district court's conclusion that disclosing the FISA materials to Omar was not necessary to make an accurate determination of the legality of the FISA surveillance.

Omar next contends that the district court should have suppressed the FISA-derived evidence admitted during trial because the Government failed to meet the probable-cause standard from FISA. To obtain approval for FISA surveillance, the Government must show probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power" and that "each of the

facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(2)(A)-(B). This probable-cause showing differs in focus from the standard in a typical criminal case. "[R]ather than focusing on probable cause to believe that a person has committed a crime, the FISA standard focuses on the status of the target as a foreign power or an agent of a foreign power." *El-Mezain*, 664 F.3d at 564. A "foreign power" includes "a group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. § 1801(a)(4). And an "agent of a foreign power" includes any person who "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power." *Id.* § 1801(b)(2)(C). Moreover, "anyone who knowingly aids, abets, or conspires with an agent in furtherance of such activities is also deemed an agent of a foreign power." *United States v. Daoud*, 761 F.3d 678, 681 (7th Cir. 2014) (citing 50 U.S.C. § 1801(b)(2)(E)).

The parties dispute the standard for reviewing a probable-cause determination under FISA. Because Omar has not seen the FISA materials and therefore cannot raise any specific arguments about them, he urges us to undertake *de novo* review. The Government, by contrast, argues for more deferential review. Courts have reached different conclusions about this issue. *See United States v. Hassan*, 742 F.3d 104, 139 n.29 (4th Cir.) (describing the different standards of review), *cert. denied*, 574 U.S. ---, 135 S. Ct. 192 (2014). This case does not require us to take a firm stance on the applicable standard of review. After thoroughly reviewing the FISA materials, we have no hesitation concluding that probable cause under FISA existed under any standard of review.

## C.     Evidentiary Issues

Omar last argues that the district court should not have admitted certain testimony of Matthew Bryden.  We review evidentiary issues for clear abuse of discretion and will reverse the district court's judgment "only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict."  *United States v. Anderson*, 783 F.3d 727, 745 (8th Cir. 2015) (quoting *United States v. Henley*, 766 F.3d 893, 914 (8th Cir. 2014)).

Omar objects to the portions of Bryden's testimony that concerned al Qaeda, Osama bin Laden, and global jihad.  Bryden testified that, in public statements, al Shabaab's leaders "supported internationalist jihadist goals" and "aligned themselves with other foreign jihadist groups who shared those goals."  Bryden recounted that after a bombing in April 2008 for which al Shabaab claimed responsibility, al Shabaab made a public statement that referenced al Qaeda and Osama bin Laden.  Bryden also testified that al Qaeda has made numerous statements about al Shabaab, including a statement by Osama bin Laden that became known as "Fight on You Lions of Somalia."  Bryden also stated that some of al-Shabaab's leaders had ties to al Qaeda and had been involved in non-al Shabaab attacks, including an attack on a hotel, an attempted takedown of an Israeli airplane, and embassy bombings.  This testimony was part of Bryden's explanation that some of al Shabaab's members "identify with foreign jihadist movements with other objectives and other causes."

Omar offers two reasons why this testimony should not have been admitted. First, Omar claims that the above-described testimony was irrelevant under Federal Rule of Evidence 401.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also* Fed. R. Evid. 702(a) (providing that expert testimony is admissible if, among other things, it "will help the trier of fact to understand the evidence or to determine a fact in issue").  The

threshold for evidence to be relevant is "quite minimal." *Anderson*, 783 F.3d at 745 (quoting *United States v. Guerrero-Cortez*, 110 F.3d 647, 652 (8th Cir. 1997)).

Bryden's testimony about al Shabaab's connections to al Qaeda, Osama bin Laden, and global jihad helped to establish the open and notorious nature of al Shabaab's activities. This fact is of consequence because the Government had to prove certain aspects of Omar's knowledge. For instance, to prove Omar guilty of providing material support to terrorists, the Government had to establish that Omar provided material support or resources "knowing or intending" that this support would be used in preparation for or in carrying out a conspiracy to murder or maim persons in a foreign country. *See* 18 U.S.C. § 2339A(a); 18 U.S.C. § 956(a)(1). Furthermore, in order to convict Omar of providing material support to a designated foreign terrorist organization, the Government had to prove, among other things, that Omar knew that al Shabaab was a designated terrorist organization, knew that al Shabaab has engaged or engages in terrorist activity, or knew that al Shabaab has engaged or engages in terrorism. *See* 18 U.S.C. § 2339B(a)(1). In light of the Government's burden of proof with respect to Omar's knowledge, Bryden's testimony about the public ties between al Shabaab, on the one hand, and al Qaeda, Osama bin Laden, and global jihad, on the other hand, was relevant. This testimony made it more likely that Omar knew about the nature of al Shabaab's activities.

Second, Omar asserts that even if Bryden's testimony was relevant, it nonetheless was inadmissible under Federal Rule of Evidence 403. Under this rule, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Anderson*, 783 F.3d at 745 (quoting *United States v. Bell*, 761 F.3d 900, 912 (8th Cir. 2014)). "When determining whether the probative value of evidence is substantially outweighed by [a danger of unfair prejudice], we accord great deference to the district court's ruling." *Id.*

By connecting al Shabaab to al Qaeda, Osama bin Laden, and global jihad, Omar contends that Bryden's testimony had an undue tendency to suggest an emotional basis for convicting him. The district court did not abuse its discretion by concluding otherwise. In a matter involving terrorism-related offenses, the Second Circuit found that an expert's testimony was not unfairly prejudicial because it was "dry and academic" and "devoid of vivid imagery that might excite the jury." *United States v. Ibrahim*, 529 F. App'x 59, 63 (2d Cir. 2013) (summary order) (quoting *United States v. Kadir*, 718 F.3d 115, 121 (2d Cir. 2013)), *cert. denied*, 571 U.S. ---, 134 S. Ct. 1321 (2014). The same can be said of Bryden's matter-of-fact testimony. Furthermore, Bryden's testimony about this topic was relatively brief. The statements to which Omar objects are dispersed among twelve or so pages of a trial transcript that spans roughly 1,800 pages. And Bryden's testimony about al Shabaab's public ties to al Qaeda, Osama bin Laden, and global jihad was not a point of emphasis during trial. Indeed, the Government mentioned it only once during closing argument. Furthermore, the same qualities that made Bryden's testimony relevant gave it a probative value that the trial judge could fairly think was not substantially outweighed by a risk of unfair prejudice. For these reasons, the district court's decision to admit Bryden's testimony was not a clear abuse of discretion.

## III.   Conclusion

The judgment of the district court is affirmed.

_____