# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-3506
_____

United States of America

*Plaintiff - Appellee*

v.

Dustin Red Legs

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Central

_____

Submitted: October 22, 2021
Filed: March 21, 2022

_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

A jury found Dustin Red Legs guilty of sexual exploitation of a child and possession of child pornography, and the district court[1] sentenced him to 264 months imprisonment. Red Legs appeals his conviction, arguing that the district court erred

_____

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

in admitting the testimony of an expert witness who compared finger and knuckle creases in sexually explicit photos with photos of Red Legs's fingers and knuckles to give an opinion as to identity. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Red Legs's conviction arises from his taking of sexually explicit photos of his ex-girlfriend's ten-year-old daughter in Eagle Butte, South Dakota. "We recite the facts in the light most favorable to the jury's verdict." United States v. Galloway, 917 F.3d 631, 632 (8th Cir. 2019) (citation omitted).

From early 2013 to September 2018, Red Legs was in an on-again, off-again relationship with Amy Pritzkau. They shared three children, and each had children from prior relationships, including Amy's ten-year-old daughter, L.B.E. In September 2018, when Red Legs and Pritzkau were not dating, Pritzkau approached Red Legs and asked if he would come to her apartment to help with their children. Red Legs agreed, and later that afternoon, he arrived at the two-bedroom apartment where Pritzkau lived with her five children (including the three shared with Red Legs). Pritzkau allowed Red Legs to spend the night after he told her that he had nowhere else to go and would help financially. Red Legs slept on a couch in the living room, while Pritzkau and three children slept in one bedroom and the other two children, including L.B.E., slept in the second bedroom. The next evening, while Red Legs took a shower, Pritzkau, concerned that Red Legs was using drugs, looked through his wallet without his knowledge. Pritzkau removed and hid a piece of paper containing Red Legs's email address and password as well as his Facebook login information. The email address contained Red Legs's full name, and the Facebook password appeared to be a reference to his children.

Red Legs stayed a second night at Pritzkau's apartment. Again, he slept in the living room while Pritzkau and three children stayed in one bedroom and the other two children, including L.B.E., slept in the second bedroom. Pritzkau testified

that around midnight, from her bedroom, she saw Red Legs enter the bedroom where L.B.E. was sleeping. Red Legs stayed in the bedroom for a couple minutes before walking back to the living room. Soon after, Red Legs returned to L.B.E.'s bedroom for a couple more minutes before walking to Pritzkau's room and asking Pritzkau if there was a phone charger in L.B.E.'s bedroom. When Pritzkau said no, Red Legs went back to the living room.

After Red Legs left the apartment the next morning, Pritzkau logged onto his email account. In the account, Pritzkau found a folder labeled "Photos." The first two photos in the folder were of fingers pulling aside underwear to expose a vagina. Pritzkau testified that she realized the photos depicted L.B.E.'s vagina based upon her recognition of five items shown: a black-and-white-striped blanket and a multi-colored zebra-print blanket on L.B.E.'s bed; L.B.E.'s white underwear and a pair of black pajama shorts that L.B.E. had asked to borrow from Pritzkau the day before; and L.B.E.'s finger that had a dark spot due to an infection. Pritzkau took screenshots of the sexually explicit photos with her cellphone. Shortly after Pritzkau used her cellphone to access Red Legs's email account, Red Legs called her and asked what kind of phone she had. The call dropped due to poor cell coverage. That same day, Pritzkau reported the explicit photos to law enforcement, and law enforcement arranged for her and L.B.E. to meet a pediatric nurse practitioner, who conducted a forensic examination of L.B.E. The nurse practitioner observed minor injuries on two of L.B.E.'s fingers. The nurse practitioner also noted that L.B.E. was a Tanner Stage III female, and she testified at trial that the vagina in the explicit photos found on Red Legs's email account belonged to a Tanner Stage III female.[2]

Later that day, Red Legs called Pritzkau again, and they had a brief conversation. Pritzkau testified that she asked him how he could do what he did, and he responded "Sorry" before hanging up. Pritzkau tried calling him back, but Red Legs did not answer. That evening, Pritzkau contacted Red Legs via Facebook

_____

[2]The Tanner stages, also known as the Tanner scale or Sexual Maturity Rating (SMR), is a scale of physical development. It defines physical measurements of development based on external primary and secondary sex characteristics.

Messenger and asked him to turn himself in. Pritzkau testified that Red Legs responded by "saying things along the lines of killing himself, that I'm never going to talk to him again, that his phone is going to be shut off."[3]

Law enforcement obtained Pritzkau's cellphone and extracted the metadata from the screenshots Pritzkau had taken. Officers testified that the metadata established that the original photos were taken approximately one minute apart, around the time Pritzkau saw Red Legs enter the bedroom where L.B.E. slept. The metadata also revealed the make and model of the cellphone that took the photos. Law enforcement could not locate Red Legs's cellphone, but they did secure a search warrant for his email account, which was linked to his cellphone. Law enforcement found the two explicit photos on his account. They also discovered photos of Red Legs's children, a construction site where Red Legs worked, and a partial selfie of Red Legs on his account. The metadata from those photos revealed that they were taken by a cellphone matching the make and model of the phone that took the explicit photos. A search of Red Legs's email account further showed that Red Legs received a security alert that another phone had accessed his account around the time Pritzkau discovered the explicit photos.

Law enforcement contacted Anthony Imel, a forensic examiner for the Federal Bureau of Investigation, to help identify whose fingers were pulling aside the underwear in the photos. Imel conducted a comparison analysis of the explicit photos, which depicted unidentified fingers and knuckles, with known photos of Red Legs's fingers and knuckles. Imel determined that, based upon the similarity of the finger and knuckle creases, the fingers and knuckles in each set of photos belonged to the same person.

In June 2020, a grand jury returned a three-count superseding indictment against Red Legs, charging him with aggravated sexual abuse of a child (Count 1),

_____

[3]Pritzkau later deactivated her Facebook account, and law enforcement could not find Red Legs's messages when examining Pritzkau's cellphone.

-4-

sexual exploitation of a child (Count 2), and possession of child pornography (Count 3). Before trial, the government filed a notice of intent to offer Imel's expert testimony, and Red Legs filed a notice of intent to call his own expert witness, Dr. Glenn Langenburg, to rebut Imel. Red Legs also filed a motion for a pretrial Daubert[4] hearing regarding Imel's proposed testimony, which the district court granted. Both Imel and Dr. Langenburg testified at the Daubert hearing. Imel shared why, in his opinion, both sets of photos displayed fingers belonging to the same person. The district court concluded that the government met the Daubert standard and Imel's testimony was admissible under Federal Rule of Evidence 702. At trial, Imel's testimony was consistent with his opinion provided during the Daubert hearing, counsel for Red Legs cross-examined Imel, and Dr. Langenburg again testified in rebuttal. The district court instructed the jury that it could accept or reject the experts' testimony, giving each as much weight as the jury believed it deserved.

After the government presented its evidence, Red Legs moved for a judgment of acquittal on all three counts, arguing that the government failed to prove the elements of each count. Red Legs also specifically argued that there was no evidence to support Count 1's element of touching, as touching clothing is insufficient. Regarding Counts 2 and 3, Red Legs argued that they should merge and that the explicit photos were not lascivious exhibition. The district court denied the motion, and after both parties rested, Red Legs renewed the motion. The district court denied the renewed motion as to Counts 2 and 3 and took it under advisement as to Count 1, pending the jury's verdict. After the jury found Red Legs guilty of all three counts, the district court granted Red Legs's motion for judgment of acquittal on Count 1 and sentenced Red Legs to 264 months imprisonment on Counts 2 and 3.

II.

Red Legs argues that the district court erred by admitting Imel's testimony. "We review evidentiary issues for clear abuse of discretion and will reverse the

---

[4]Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

district court's judgment 'only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict.'" United States v. Omar, 786 F.3d 1104, 1112 (8th Cir. 2015) (citation omitted). "We will not reverse a harmless error." United States v. Johnson, 860 F.3d 1133, 1139 (8th Cir. 2017).

Red Legs contends that Imel lacked the qualifications necessary to provide an expert opinion as to identity based upon the comparison of finger and knuckle creases as shown in the two sets of photos. Red Legs emphasizes that the complex field of finger and knuckle crease analysis is still nascent and that Imel failed to rely on the research developed so far by the field's scientific community. Red Legs claims that Imel instead used a generic method unreliable for the comparison of finger and knuckle creases. "Under Federal Rule of Evidence 702, expert testimony is admissible if the expert's 'knowledge, skill, training, experience or education will assist a trier of fact in understanding an area involving specialized subject matter.'" Id. (citation omitted). "In the case of all expert testimony the district court serves as a gatekeeper to ensure that only reliable and relevant expert testimony is presented to a jury." United States v. Merrell, 842 F.3d 577, 582 (8th Cir. 2016).

We need not decide whether the district court abused its discretion by admitting Imel's testimony because if there was any error, it was harmless. "An evidentiary error is harmless when, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." United States v. Farish, 535 F.3d 815, 820 (8th Cir. 2008) (citation omitted). "Improperly admitted testimony warrants reversal of a conviction if the testimony 'substantially influence[d] the jury's verdict.'" Merrell, 842 F.3d at 582 (alteration in original) (citation omitted). Imel's testimony could not have substantially influenced the jury's verdict because, even absent his testimony, the government provided overwhelming evidence of Red Legs's guilt. Pritzkau saw Red Legs enter L.B.E.'s bedroom around the time the explicit photos were taken. Pritzkau recognized that the photos were of L.B.E. based on other items shown in the photos. The explicit photos were found in Red Legs's

email account along with stored photos of Red Legs and his children that were taken by the same phone that took the explicit photos. Red Legs also made inculpatory statements to Pritzkau, including an apology, when she confronted him about the explicit photos. Further, a layperson examining the two sets of photos could discern similarities between the fingers in the explicit photos and the fingers in the known photos of Red Legs. Accordingly, because substantial evidence other than Imel's testimony supported the jury's verdict, any error in admitting Imel's testimony was harmless and does not warrant reversal.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____