In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1426

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRIS J. KOKENIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07-CR-801—**Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 28, 2011—DECIDED NOVEMBER 23, 2011

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A jury found Chris J. Kokenis
guilty of eight counts of filing a false income tax return
in violation of 26 U.S.C. § 7206(1). He appeals both the
convictions and his sentence. He contends that the
district court erred in ruling that he could not present
evidence of good faith unless he waived his Fifth Amend-
ment rights and testified. He also argues that the court
erred by relying on acquitted conduct in determining the

sentence to be imposed. Although the district court applied the wrong standard in determining whether Kokenis could assert good faith, the error was harmless given the overwhelming evidence of a lack of good faith. The court properly excluded the evidence at issue, and our precedent precludes Kokenis's argument about acquitted conduct. We therefore affirm.

## I. Background

Jim Kokenis, Chris Kokenis's father, started two companies, Delta Oil Corporation and Delta Energy Corporation, which explored for oil and natural gas, leased mining rights from landowners, and sold "working interests" in their drilling projects to investors. Chris Kokenis was president of both Delta Oil and Delta Energy and, along with his two sisters, was a shareholder of Delta Energy.[1] Delta Energy was a Subchapter S corporation for federal taxation purposes, which means that its income and tax burden flow through directly to its shareholders and the shareholders are supposed to report the income on their tax returns and pay the appropriate tax. Orlando Mondero was the controller and accountant for Delta Oil and Delta Energy. In 1998 he contacted the Internal Revenue Service with concerns about fraudulent transactions.

---

[1] From this point forward we will refer to Chris Kokenis as Kokenis. If we are referring to Jim Kokenis, we will use his full name to distinguish the two.

The IRS audited Delta Oil, Delta Energy, Jim Kokenis, and Delta Energy's shareholders: Kokenis and his two sisters. IRS Revenue Agent Thomas Dorsey, who conducted the audit, reviewed large sales transactions between the two Delta corporations and two gas and oil investment companies, Roemer-Swanson Energy Corporation and Whiting Petroleum Corporation. He also reviewed compressor sales between Delta Energy and Robert Rosin and personal expenses of Kokenis that were paid by Delta Energy. These included real estate taxes on his residence, residential construction upgrades on his residence, and a sales commission on the sale of his residence.

Steve Swanson, former president of Roemer-Swanson, testified that in 1996 Roemer-Swanson purchased a working interest in a well project from Delta Oil with a purchase price of approximately $3.92 million. In September 1996, Delta Oil transferred $1,721,376 of the money it received from Roemer-Swanson to Delta Energy. Swanson testified that no portion of the purchase price was allocated as an advance to pay for future drilling and that Roemer-Swanson did not give any money to Delta Oil to hold in an account on behalf of Roemer-Swanson.

Mondero recorded the Roemer-Swanson sale in Delta Energy's books, noting that Delta Oil owned $695,424 and Delta Energy owned $1.7 million, with the remainder going elsewhere. When he prepared Delta Energy's 1996 tax return, he included the $1.7 million as income and gave a draft of the return to Kokenis. Mondero testified that Kokenis said there was too much money and it had

to be reduced. Mondero said that he prepared another tax return as Kokenis requested and when he showed it to Kokenis, Kokenis told him it had to be reduced further and to show no profit on the sale. Mondero did as requested, and the final tax return did not show any income from the Roemer-Swanson sale. Kokenis signed the return, and Mondero mailed it to the IRS. Mondero testified that Kokenis later told him to recognize the transaction as a liability rather than a sale. As instructed, Mondero prepared a journal entry, dated December 31, 1997, reversing the sale. The entry noted: "Sales to record drilling liability to Roemer Swanson Energy Corporation[.]" The effect was to reduce Delta Energy's income by $1.7 million.

The parties entered into a second contract in November 1996, pursuant to which Roemer-Swanson bought a larger stake in some of the same well projects from Delta Oil for $6.75 million. Swanson testified that this contract, like the first, did not allocate any portion of the purchase price for future development or drilling and that Roemer-Swanson did not advance any money to Delta Oil to cover the cost of future drilling under that contract. Mondero recorded the sale in a journal entry on the Delta Energy books, reflecting receipt of $1.9 million from Delta Oil and recognizing the money as a sale to Roemer-Swanson. Mondero testified that he prepared a tax return for Delta Energy for the tax year 1997 based on the profit and loss statements and balance sheet. He said that he presented the income statement and tax calculations to Kokenis who told him to reduce the income, specifically instructing him to reverse the

sale to Roemer-Swanson by recognizing it as a liability instead of a sale. Mondero did as instructed and reversed the sale in a journal entry. The effect of the reversal was that the money received from the sale was not reported as income by Delta Energy. Dorsey testified that the money was treated as an advance from the investor. Mondero stated that he prepared a tax return after the transaction had been reversed on the books. Kokenis signed it and Mondero, at Kokenis's direction, sent the return to the IRS.

This pattern was repeated with two Whiting Petroleum transactions. First, in June 1998, Whiting Petroleum entered into a purchase and sale agreement with Delta Oil and others to purchase a working interest in well projects for approximately $4.8 million. Whiting Petroleum entered into a second purchase and sale agreement with Delta Oil in December 1999 for the purchase of interests in oil and gas wells for $4.15 million. The settlement date was January 10, 2000. John Hazlett, a Whiting Petroleum vice president in the late 1990s, testified that no portion of the purchase price for either transaction was allocated to pay the cost of drilling new wells in the future. He also said that Whiting Petroleum did not advance any money to Delta Oil to pay for such a cost and did not pay Delta Oil any money to be held on account on behalf of Whiting Petroleum.

Mondero testified that he initially recorded the Whiting Petroleum transactions in the Delta Energy books and records as sales, explaining that Kokenis identified them to him as sales. Mondero prepared a tax return for Delta

Energy for the tax year 1998 based on the profit and loss statements and his tax calculations. He testified that when he presented his calculations to Kokenis, Kokenis told him that the income was too big and needed to be reduced. Kokenis instructed him to reverse the sale to White Petroleum. Mondero did as instructed, increasing Delta Energy's liability and reducing its taxable income by $2.7 million. Mondero received no supporting documentation to support the reversal. Then Mondero prepared a tax return based on Kokenis's instructions, Kokenis signed it, and Mondero filed it with the IRS. Mondero also testified that he prepared the tax return for Delta Energy for the tax year 2000 based on the profit and loss statements and his tax calculations. He claimed that when he showed his calculations to Kokenis, Kokenis told him to reduce the income from the Whiting Petroleum sale. Mondero did so and recorded a liability to Whiting Petroleum instead of proceeds from the sale, thus reducing taxable income. Mondero testified that he was not holding any money on behalf of Whiting Petroleum and had no documentation to that effect. According to Mondero, Kokenis never offered any explanation why he wanted Mondero to reverse or reduce the sales transactions. Nor did Kokenis explain why the money received wouldn't be treated as income.

Dorsey reviewed questionable Delta Energy journal entries concerning a transaction for $2,757,773.60. The first entry, date stamped July 20, 1998, classified the transaction as a sale and stated: "To record proceeds from Roemer-Swanson for drilling of new wells in various projects." (The reference to Roemer-Swanson instead of

Whiting Petroleum appears to have been an error.) A second journal entry reversed the sale with the effect of decreasing Delta Energy's income by approximately $2.7 million. Curiously, Dorsey received two different copies of the second journal entry. The first, Government Exhibit 36, was from Mondero; the other, Government Exhibit 37, was from accountant Vito Loisi (speaking for Kokenis through power of attorney) in response to Dorsey's request for documents related to the 1998 Whiting Petroleum sale. Dorsey testified that the copy of the journal entry from Mondero noted: "To reverse sale of working interest in various wells to Whiting Petroleum per Chris Kokenis . . . ." However, the copy provided by Loisi stated: "To reclass proceeds from Whiting Petroleum transaction." Dorsey testified that this would likely refer to a deposit or an advance rather than a sale. Dorsey requested backup documentation and an explanation as to where the transaction was described as an advance. He was never provided that information. Dorsey also testified the attachments to the two copies of the journal entries were not the same and the wrong account number was used on the copy he received from Loisi.

Robert Rosin testified that in 1997 he invested just over $300,000 in Delta Energy by purchasing a working interest in compressors. He identified a letter, dated November 26, 1997, which said that it "shall evidence an agreement by and between Delta Energy Corporation and yourself with respect to your purchase of an interest in nine (9) specific compressors." The letter stated that the total purchase price was $303,250 and referred to an

attached list specifying the nine compressors by unit and serial number with handwritten notations referencing the particular projects involved. Rosin identified two checks he made on December 4, 1997, to Delta Energy for a total of approximately $317,000, which reflected the purchase price and some additional charges.

As part of his examination, Dorsey reviewed Delta Energy's records regarding the sale of an interest in compressors to Rosin. A journal entry, dated July 20, 1998, stated: "To record sale of ten percent working interest in compressors to Robert Rosin per attached." Dorsey copied the journal entry and attachments while in Loisi's office. The sale was reversed in another journal entry, date stamped March 10, 1999, and April 12, 1999, which said: "To reverse sale of compressors to Robert Rosin per Chris Kokenis." When Dorsey subsequently attempted to review the transaction at a later time, the journal entry reversing the transaction was missing from the book of journal entries. Dorsey asked Loisi to provide him a copy of the entry and supporting documentation for the transaction. Loisi advised that there were two checks, one for $200,000 for an advance for future compressor purchases and the remaining $117,250 for a sale. Dorsey asked for backup documentation, and Loisi reported that the journal entry page was placed back in the book. Dorsey questioned Loisi why the transaction was booked in 1998 instead of 1997, when the corporation received the money that was paid by Rosin. Loisi reported that the taxpayer was unsure which compressors were being sold and didn't book the transaction until that was determined. Recall, however, that the Novem-

ber 26, 1997, letter to Rosin identified the nine compressors by unit and serial number.

Loisi also provided Dorsey with a copy of a letter to Rosin in an attempt to substantiate the claimed advance. The letter identified only a portion of the entire transaction as a sale with a purchase price of $103,250 and identified $200,000 as an advance or investment. The effect was to reduce the corporation's income by $200,000. Rosin testified that the signature on the letter, purportedly indicating his agreement with the letter's terms, was not his own. He also testified that giving Delta Energy $200,000 to hold for future purchase of unidentified compressors was not consistent with his investment strategy at the time. Rosin added that a net return of $6,100 per month, as indicated on Delta Energy's October 21, 1997, letter offering him the opportunity to purchase an interest in the compressors would be "quite a return" on a $103,000 investment.

In addition to this manipulation of Delta Energy's books to reduce the income reported, the evidence at trial supported a finding that for tax years 1997 through 2000, Kokenis used Delta Energy funds to pay personal expenses and caused them to be recorded as business expenses. This had the effect of reducing Delta Energy's income as well as his own. In 1997 Kokenis used Delta Energy funds to pay Santefort Enterprises, Inc., a high-end residential builder, for upgrades to the new home he was purchasing. Thomas Santefort testified that Kokenis was one of his clients and had purchased three homes from his company. Santefort identified a $69,258.77

check payable to Santefort Enterprises for extras associated with the home Kokenis purchased at Five York Lake Court in Oak Brook, Illinois. The check was written on Delta Energy's account. Santefort identified another record pertaining to additional extras performed on that residence and payment by a $10,470.66 check written on Delta Energy's account.

Dorsey testified that he requested backup and supporting documentation from Loisi regarding these payments to Santefort Enterprises. Loisi told Dorsey that Kokenis had confirmed that the expenses were business expenses. Dorsey again requested backup documents. Loisi presented Dorsey with two invoices purportedly on Santefort letterhead related to drilling pipeline expenses for items such as plastic line pipe and transportation charges. At trial, Santefort testified that the letterhead had been changed—the reference to "real estate investment and development" was gone. He also said that his company did not provide the kind of supplies and services identified in the purported invoices, the invoices were not prepared by his company, and he had not authorized the use of his company letterhead or preparation of the invoices.

In addition, the evidence established that in 1999, Kokenis used Delta Energy funds to pay Santefort a $75,000 sales commission in connection with the sale of his home at Five York Lake Court. Kokenis paid the commission in four separate $18,750 checks each drawn on Delta Energy's account payable to Thomas Santefort or his brother, David Santefort. The Delta Energy general

ledger listed the payments as a commission expense, thus reducing Delta Energy's income. Thomas Santefort testified that his company never provided any goods or services to Delta Energy.

Dorsey reviewed Delta Energy's general ledger for the tax years 1997 through 2000 and discovered that the corporation paid the personal real estate taxes for Kokenis's residence. The general ledger entries indicated that these were business expenses, reducing the income reported by the corporation. Delta Energy did not own any real estate. The parties stipulated that if called as a witness, Kathleen Guerra would testify that she has been employed by Delta Energy, that Kokenis identified which bills would be paid and when, and that she generated the checks from a list he provided.

Kokenis did not contest the evidence that he told Mondero to reverse the sales transactions involving Roemer-Swanson and Whiting Petroleum or that his personal expenses were deducted as business expenses. Nor did he contest that false documentation was provided to the IRS, although he emphasized that Dorsey did not receive any of the documents from him personally. Kokenis vigorously challenged whether Mondero was truthful and argued that the government failed to prove that he committed the offenses willfully. Kokenis requested a jury instruction on good faith, but the district court refused to give it because it believed that he had to testify to be entitled to such an instruction.

The jury convicted Kokenis of four counts of willfully making and causing to be made false income tax returns

of Delta Energy for tax years 1997-2000 and four counts of willfully making false individual income tax returns on behalf of himself and his wife for tax years 1997-2000, all in violation of 26 U.S.C. § 7260(1). He was acquitted of counts involving his sisters's returns. Kokenis moved for a new trial, arguing that he was entitled to a good-faith instruction, that the district court erred in excluding testimony from several witnesses which related to good faith, and that the district court shifted the burden of proof to him. The motion was denied, Kokenis was sentenced, and he appealed.

## II. Discussion

At trial Kokenis wanted to argue that he had a good-faith belief that he wasn't violating the tax laws. He argues that the district court erred because it would not allow him to present any evidence of good faith or even a good-faith argument unless he testified. This, he claims, burdened his Fifth Amendment and due process rights. He also argues that he was entitled to a good-faith jury instruction. Finally, he challenges the court's consideration of acquitted conduct at sentencing.

## A. Evidentiary Rulings

Kokenis argues that the district court precluded him from presenting evidence that would have supported a good-faith argument. He specifically challenges the exclusion or limitation of testimony by five witnesses: John Tripp, Steve Swanson, Jim Kokenis, Orlando

Mondero, and Timothy Brock. We review evidentiary rulings for an abuse of discretion. *United States v. Stallworth*, 656 F.3d 721, 727 (7th Cir. 2011).

Tripp, a tax accounting professor, would have testified that the pool of capital theory allows for "non-recognition for tax purposes in the year of the transaction of certain sales of working interests in oil and gas development projects." In deciding whether to admit expert testimony, a district court must determine whether the expert "had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (quoting 4 J. McLaughlin, *Weinstein's Federal Evidence* ¶ 702.05[1], p. 702-33 (2d ed. 1998)); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011) ("The bottom line of *Kumho Tire . . .* is that one major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case."). Tripp did not offer any opinion that the theory was applicable to any transaction in this case. Furthermore, Kokenis offered no evidence that he actually relied on the pooling capital theory, so testimony about the theory would be irrelevant, confusing, and perhaps even misleading. Therefore, the testimony was properly excluded under Federal Rules of Evidence 402 and 403. *See United States v. Loughry*, No. 10-2967, 2011 WL 4790540, at *3 (7th Cir. Oct. 11, 2011). Even if Kokenis's testimony was the only means by which Kokenis could lay a proper foundation for Tripp's testimony, Kokenis's Fifth Amendment rights would not be violated simply because he had to choose between not testifying and

laying that foundation. *See Williams v. Florida*, 399 U.S. 78, 84 (1970) ("That the defendant faces . . . a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination."); *United States v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011) ("Just because [the defendant] would have had to take the stand to present his theory of the defense does not mean he was penalized for not doing so.").

Kokenis also maintains that Tripp would have testified that the labels on relevant transaction documents are not determinative of tax treatment, small differences in transaction structure can lead to different taxable outcomes, and errors can be made. Such testimony would have been irrelevant given the uncontested testimony by Swanson and Hazlett that the transactions at issue were in fact sales transactions, none of the purchase price was allocated for future drilling, and no money was advanced for future drilling. Moreover, Tripp did not analyze any of the transactions at issue in this case. Offering testimony on a theory in general, without tying it to the case on trial is insufficient. *See, e.g.*, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (concluding that expert testimony was admitted in error where expert's opinions "were not tied to specific portions of the [document at issue] and appeared to be general observations regarding what is normal or usual business practice").

Swanson was to explain "Delta Energy's continuing development obligations to the landowner and

working interest owners, and its obligation to the re-
maining working interest owners in the event of non-
consent by others." This testimony, Kokenis submits, was
relevant to Jim Kokenis's testimony about times when
Delta Oil did not meet its obligations. Jim Kokenis was
to testify that "funds from sales of interests in well
projects needed to be set aside by Delta Energy to meet
its continuing obligations to mineral rights owners
for future project development, *i.e.*, a drilling fund." To-
gether, this evidence purportedly would have estab-
lished reasons why Kokenis needed to set aside money
in a drilling fund. Jim Kokenis's testimony that *Delta Oil*
had a drilling fund has little bearing on whether *Delta
Energy*, a separate corporation, also had a drilling fund.
But even if Kokenis put funds from sales transactions
into a drilling fund (and he offered no evidence that he
did), that doesn't explain why he didn't also report the
funds as income. Furthermore, Swanson's "obligations
testimony" was irrelevant and properly excluded under
Rule 402 as well as under Rule 403 based on considerations
of waste of time, jury confusion, and misleading the jury.

Mondero would have testified about treatises dis-
cussing circumstances under the law "in which the pro-
ceeds of sales of working interests need not be recognized
as income for tax purposes in the year of the transac-
tion," basically, the pool of capital theory. Such testimony,
like Tripp's testimony on the theory, was properly ex-
cluded. Kokenis offered no evidence that the theory
even applied to any of the transactions. There was, for
example, no evidence that Swanson-Roemer, Whiting
Petroleum, or Rosin funds were to be used for future

development. Indeed, the evidence was to the contrary. And again, there was no evidence that Kokenis relied on the theory. The mere existence of the theory without evidence of Kokenis's knowledge of and reliance on the theory is insufficient to support the assertion of good faith. *See Naeem*, 444 F.3d at 608.

Brock is a petroleum geologist who would have presented "background information about the business of developing natural gas from the Atrium Shale in Michigan, including the multiple business and risk considerations at play." Kokenis argues that Brock had "helpful information about the drilling process and the eventual delivery of gas to the buyer that would have provided context." This background information (what the district court referred to as a "short course or a long course in oil development") was not relevant because it was unconnected to the facts and issues in this case. It wouldn't have been helpful to the jury, and presenting it would have been confusing and a waste of time, all of which justify its exclusion under Rules 402, 403 and 702. *See, e.g.*, *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (concluding that testimony did "not pass muster under Rule 702" because it was unhelpful to the jury).

Kokenis also argues that Brock's testimony "would have provided a layer of credibility to [the] argument that he did not act willfully when he proposed to Mondero that the sales transactions not be reported as income, and that companies in Delta Energy's position had to have funds available to account for unseen contin-

gencies." Brock's testimony would not lend credibility to Kokenis's good-faith argument because it was not tied to the facts and issues in this case. In addition, a company's need to prepare for unforseen contingencies has no bearing on whether funds received should be treated as income. And as the government notes, the court left the door open for Kokenis to offer a limited amount of testimony from Brock as necessary "to tee up" his ability to assert a good-faith defense. Kokenis didn't take advantage of that opportunity, however; he did not call Brock to testify.

The district court's exclusion and limitation of certain evidence did not constitute an abuse of discretion.

## B.  Assertion of Good Faith

Kokenis next argues that the district court erred in ruling that he could not assert a good-faith theory of defense unless he testified. He also claims that he was entitled to a jury instruction on good faith. We review the district court's determination of the proper legal standard and its refusal of a theory-of-defense instruction de novo, *United States v. Martin*, 618 F.3d 705, 735 (7th Cir. 2010); *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005).

"A defendant is entitled to an instruction on his theory of defense only if '(1) the instruction provides a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of the defense is not part of the government's charge; and (4) the failure

to include the instruction would deprive the defendant of a fair trial.'" *United States v. Campos*, 541 F.3d 735, 744 (7th Cir. 2008) (quoting *United States v. Millet*, 510 F.3d 668, 675 (7th Cir. 2007)). A defendant "only needs to demonstrate a foundation in evidence, 'however tenuous,' to support his theory, but a 'mere scintilla of evidence . . . is not sufficient to warrant a defense instruction.'" *United States v. Canady*, 578 F.3d 665, 672-73 (7th Cir. 2009) (quoting *United States v. Buchmeier*, 255 F.3d 415, 427 (7th Cir. 2001)). Viewing the instructions as a whole, "a defendant is not entitled to a specific instruction if a jury was adequately instructed on [his] theory of defense." *United States v. Reed*, 539 F.3d 595, 599 (7th Cir. 2008).

The district court's rulings can be reasonably understood as requiring Kokenis to testify (and waive his Fifth Amendment rights) in order to assert good faith. For example, in ruling on the government's motion in limine to exclude certain statements under Rule 702, the court said: "[I]n a criminal case the defendant has no obligation to introduce evidence. . . . When it comes, however, to [a] good faith defense of the kind that I understand to be asserted here, that is an obvious exception . . . because good faith . . . has to do with intent." The court added that *Cheek v. United States*, 498 U.S. 192 (1991), taught that "if somebody really had a subjective belief and it was an honest belief, that that could constitute a good faith defense. But by definition that is something that has to come from the defendant." And in denying the motion for a new trial, the court wrote that "in order to advance . . . any assertion of a good faith defense and thus

to bring *Cheek* into play, Kokenis had to take the stand, for no one else could demonstrate *his* good faith *belief*."

The court erred in thinking that evidence of Kokenis's state of mind had to come from Kokenis's own testimony. *See, e.g., United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994) ("'[T]he standard of evidence necessary to warrant a [good-faith reliance] instruction cannot include an absolute requirement that the taxpayer must testify, for that would burden the taxpayer's own Fifth Amendment right against self-incrimination.'") (quoting *United States v. Duncan*, 850 F.2d 1104, 1115 n.9 (6th Cir. 1988)); *United States v. Phillips*, 217 F.2d 435, 442 (7th Cir. 1954) (noting that evidence of defendant's good-faith reliance on advice of counsel can come from the government's witnesses or the defendant's witnesses). Although a defendant's own testimony might be the best evidence of that defendant's good faith, a defendant can offer evidence of good faith in other ways. For example, circumstantial evidence may tend to show good faith and hearsay statements of the defendant may suggest a defendant's belief.

Nonetheless, Kokenis was not entitled to a good-faith instruction. First, the evidence did not support this theory of good faith. Kokenis's claim that the district court wouldn't allow him to present evidence of good faith unless he testified is wrong. He simply didn't offer any evidence relevant to his good faith. For example, Kokenis wanted to present evidence of the pool of capital theory and Delta Energy's obligations to landowners and working interest owners. He argues that this evi-

dence "would have provided a layer of credibility to [his] argument that he did not act willfully when he proposed to Mondero that the sales transactions not be reported as income[.]" But Kokenis made no effort to tie such evidence to his state of mind. He offers nothing but speculation to suggest that he relied on such information in directing Mondero to change records and tax returns. Kokenis seems to be asserting that just because there may be evidence to show that someone could have had a good-faith belief that he wasn't violating the law, then he should be able to present such evidence to the jury. Not so. Without any connection to his state of mind, such evidence is irrelevant.

Furthermore, as the government points out, the evidence of the pool of capital theory has no bearing on Kokenis's claims of personal expenses as business expenses. The government was required to prove only that he filed a return that he did not believe was true and correct to "every material matter." *United States v. Pansier*, 576 F.3d 726, 736 (7th Cir. 2009). Kokenis doesn't offer any explanation as to how claiming his personal expenses as business expenses could have comported with good faith. His suggestion that Mondero was responsible for the false statements regarding personal deductions and fraudulent documents such as the fake Santefort invoices and fallacious Rosin signature is absurd. Thus, a finding of good faith with respect to the sales transactions would not have precluded his convictions.

Another reason Kokenis was not entitled to an instruction on good faith: the theory was already part of the

charge. Willfulness is an essential element of the tax evasion offenses charged under 26 U.S.C. § 7206(1). *United States v. Hills*, 618 F.3d 619, 634, 638-39 (7th Cir. 2010), *cert. denied*, 2011 WL 4530535 (U.S. Oct. 3, 2011) (No. 10-10220). The good-faith theory "is essentially a claim that [the defendant] did not act willfully." *United States v. Brimberry*, 961 F.2d 1286, 1291 (7th Cir. 1992) (quotation omitted); *see also Cheek*, 498 U.S. at 202 (government's burden of proving willfulness requires "negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any" law). The district court properly instructed the jury on the elements of the offenses under § 7206(1), including that the government had to prove that "when defendant made and signed the tax return he did so willfully and didn't believe that the tax return was true, correct and complete as to every material matter." The court properly defined "willfully" as "the voluntary and intentional violation of a known legal duty or the purposeful omission to do what the law requires." The court further instructed that "defendant acted willfully if he knew it was his legal duty to file truthful income tax returns and he intentionally filed false returns." We note, too, that the court also instructed the jury that the government had the burden of proving the propositions (elements) beyond a reasonable doubt and that the burden of proof stays with the government throughout the case. The district court's instructions on willfulness "necessarily encompassed" the defense theory of good faith. *See Brimberry*, 961 F.2d at 1291; *see also United States v.*

*Pomponio*, 429 U.S. 10, 13 (1976) (per curiam) ("The trial judge . . . adequately instructed the jury on willfulness. An additional instruction on good faith was unnecessary."). The jury could not find *both* that Kokenis acted willfully as defined in the instructions *and* that he acted in good faith. *See United States v. Koster*, 163 F.3d 1008, 1012 (7th Cir. 1998) ("[T]he jury could not have found that [the defendant] knowingly committed mail fraud and/or knowingly made false statements . . . and yet simultaneously have found that [he] acted in good faith. . . . Accordingly, [his] theory of defense was already part of the . . . charge.").

Thus the district court did not err in refusing to give Kokenis's good-faith instruction. Moreover, the district court's mis-impression that Kokenis could not assert good faith unless he himself testified was harmless because it did not affect his "substantial rights." Fed. R. Crim. P. 52(a). The evidence of his guilt, especially the phony documentation of personal deductions, was overwhelming. The good-faith argument was directed only to the income side of the false tax returns, not to the deduction of personal expenses. On the record before us, the district court's error did not affect Kokenis's substantial rights and does not require remand. *See United States v. Benabe*, 654 F.3d 753, 772 (7th Cir. 2011) (Rule 52(a) "means what it says: 'Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.'").

### C.  Acquitted Conduct

Kokenis argues that the district court's use of acquitted conduct in determining his sentence violated his constitutional rights. He concedes that circuit precedent forecloses this argument, *see, e.g.*, *United States v. Black*, 625 F.3d 386, 394 (7th Cir. 2010) ("'A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'") (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam)), *cert. denied*, 131 S. Ct. 2932 (U.S. May 31, 2011) (No. 10-1038), and raises it only to preserve it for review by the Supreme Court.

### III.  Conclusion

Kokenis's convictions and sentence and the district court's judgment are AFFIRMED.