**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 19a0476n.06**

**No. 18-3620**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Sep 11, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| JAMES D. MOODY, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     BOGGS, BATCHELDER, and STRANCH, Circuit Judges.

**BOGGS, Circuit Judge.** This case arises out of a fraud masterminded by Daniel Morris. One witness described Morris as "a male Mother T[e]resa." Instead of giving charity to the poor of Kolkata, he gave cash, houses, and cars to his employees and associates in Toledo, Ohio. He paid for these gifts by defrauding the government. Morris was the general manager of a company called BRIDGES, which had contracts to give job training to recipients of Temporary Assistance to Needy Families. BRIDGES did provide the training, but Morris overbilled for its services by at least $3.5 million.

One recipient of Morris's largesse—almost $560,000 of it—was James Moody, the sole owner of BRIDGES. Moody received purported dividends, paychecks and health insurance for a no-show job, money for a vacation, and cash infusions for his struggling real-estate business. All of this money came out of corporate checking accounts owned by BRIDGES. After the IRS

discovered the overbilling, a jury convicted Moody of conspiracy, federal-program fraud, and money laundering.

On appeal, Moody contends that the district court abused its discretion by denying his motion to admit expert testimony. He also challenges the sufficiency of the evidence. Finally, he argues that his sentence is procedurally unreasonable. Finding these arguments unpersuasive, we affirm.

## I. Background

BRIDGES opened for business in 2001. Moody invested $50,000 to start the company, and by the time of the events at issue in this case, he was its sole owner. But he "made . . . clear from the get go that [he] did not want to have any kind of role" in its day-to-day operations. Instead, Morris served as general manager, and his job "was to run everything."

From 2004 to 2015, BRIDGES entered into 17 contracts with the Lucas County, Ohio, Department of Job and Family Services worth about $15.7 million. These contracts related to TANF, a cash-assistance program for certain low-income households. The federal Department of Health and Human Services funds TANF by giving block grants to the states. In Ohio, the state passes the money to county agencies, which administer the program. Lucas County hired BRIDGES to help TANF recipients find and train for jobs.

BRIDGES was a for-profit company, but its contracts with Lucas County prohibited it from making a profit on its TANF business. Instead of fixing fees in advance, the contracts required BRIDGES to pay its own expenses and periodically request reimbursement from the county for the actual cost of its programs.

This is where the fraud happened. BRIDGES did real work, but Morris inflated the reimbursement requests. He invented "ghost employees," overstating the company's payroll

expenses, and he also exaggerated his real employees' transportation expenses. To survive annual audits by the county, Morris ordered his accountant to keep "a separate set of books." For further documentation, Morris and the bookkeeper falsified bank records, audit reports, and board-meeting minutes. They also created fake time sheets and mileage reports. Morris admitted at trial that his purpose was to make a profit on the supposedly not-for-profit TANF contracts.

Morris got caught because of a parallel tax-fraud scheme. He withheld payroll taxes from BRIDGES employees' paychecks and pocketed the money instead of remitting it to the Treasury. The IRS found out; its investigation soon uncovered the overbilling scheme. The IRS also learned that Morris had passed a hefty share of the overbilling proceeds on to Moody.

The payments to Moody totaled $559,806.12, and they fell into four categories.

o *Salary:* Moody was not a BRIDGES employee and he did no work for the company, but Morris put him on the payroll anyway. Moody's salary for his no-show job was about $70,000 per year, plus health insurance. Later, the paychecks went to Moody's wife instead; she also did no work for the company. These payments totaled $396,198.79, and they only stopped when BRIDGES lost its TANF contracts and shut down.

o *Dividends:* Moody received several checks from a BRIDGES account, totaling at least $17,000, that were labeled as dividends. He accepted these checks even though dividends to shareholders were not a reimbursable expense under the not-for-profit TANF contracts.

o *Real estate:* Moody's primary business was another company he owned, Flex Realty. "[W]hen things started getting rough in the real estate industry, and Flex Realty was having some trouble," Morris used BRIDGES money to "help[ ] [Moody] with his cash flow," to the tune of $14,600. Morris gave Moody more BRIDGES money so that the pair could buy an apartment building as a joint investment. According to Moody, these payments were loans, not gifts, but there were no written agreements, and he never paid Morris back for his share of the apartment building.

      o  *Miscellaneous personal expenses:* Morris used BRIDGES money to help Moody pay for a vacation in Africa and to cover some of Moody's legal fees when the IRS investigation began.

A grand jury returned a 29-count indictment against BRIDGES, Morris, Moody, and co-defendants Victoria Hawkins and Angela Bowser. (We address Hawkins's and Bowser's appeals, Nos. 18–3497 and 18–3499, in separate opinions.) Morris pled guilty to reduced charges. The district court dismissed the charges against BRIDGES on the government's motion. Moody went to trial (along with Hawkins and Bowser). The jury convicted him of:

| Count(s) | Offense | Statute |
|---|---|---|
| 1 | Conspiracy to commit program fraud and mail fraud | 18 U.S.C. § 371 |
| 2 | Program fraud | 18 U.S.C. § 666(a)(1)(A) |
| 13 | Money-laundering conspiracy | 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(h), 1957(a) |
| 20–22 | Money laundering | 18 U.S.C. § 1956(a)(1)(B)(i) |

The district court sentenced Moody to five and a half years in prison.

## II. Excluded Expert Testimony

At trial, Moody moved to call Garth Tebay, a CPA, as an expert witness. The district court denied his motion, concluding that Tebay's proposed testimony was "untethered . . . to the facts of this case," and therefore "neither relevant nor reliable." Moody argues that this was an abuse of discretion. We disagree.

When a litigant wants to introduce expert testimony, the district court has "a gatekeeping role" and must ensure that the proposed testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Expert testimony is admissible if, as relevant here:

1. "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,"

2. "the testimony is based on sufficient facts or data," and

3. "the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702(a)–(b), (d).

"The question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (cleaned up). Put another way, Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592. Tebay's proposed testimony was insufficiently connected to the facts and issues in this case, so the district court did not abuse its discretion by excluding it. The proposed testimony covered three topics, which we will discuss in turn.

A

Tebay first would have testified about "the reasonable expectations of the sole owner of a small, *for profit*, C Corp." He planned to opine that "on average, people who invest in small, closely-held companies make a lot [of] money on their investment," and therefore "it was not fishy that Moody got money from BRIDGES for other than his labors." But the fishiness of Moody's arrangement depends on the legitimacy of the company's profits and the terms of its contracts, and there is no indication in the record that Tebay read those contracts or knew the details of the business. No matter how good an accountant he is, Tebay's opinion would not have been "based on sufficient facts or data," so it was inadmissible. Fed. R. Evid. 702(b). *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Moody also failed to establish the relevance of Tebay's statement that on average, small-business owners profit from their investments. Moody's defense centered on his own subjective expectations about his investment in BRIDGES. He claimed that he anticipated making a profit, and he did not know that BRIDGES was only supposed to be reimbursed for its actual costs, so he did not find it suspicious when he received infusions of company cash. Tebay would have testified about something different: the hypothetical expectations of the average small-business owner. Tebay's proposed testimony did not address "[t]he particular issue in this case," so it was inadmissible. *Kumho Tire*, 526 U.S. at 157. *See also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (holding expert testimony inadmissible where it "appeared to be general observations regarding what is normal or usual business practice" and was "not tied to specific portions" of the other evidence in the case).

B

Next, Tebay planned to testify about "the average return on a $50,000 investment in companies in the Vocational Rehabilitative Services industry operating in the State of Ohio" or elsewhere in the Midwest "during the relevant time period." The amount of money Moody got from BRIDGES "did not exceed the rate of return of the average investor in this industry sector." Again, Tebay's analysis was not connected to Moody's own expectations about his investment in BRIDGES. Moody wanted the jury to make the following chain of inferences:

1. The average return on a $50,000 investment in a Midwestern vocational-rehabilitation company during the relevant time period was $n$ dollars per year.

2. Moody believed that BRIDGES was comparable to the average company in this comparison group.

3. Therefore, Moody expected his investment in BRIDGES to also return $n$ dollars per year.

4. BRIDGES paid Moody $n$ dollars per year or less.

5. Because the money he received from BRIDGES did not exceed his expected return, Moody did not know or suspect the payments to be fraudulent.

Tebay's testimony would have established Step 1 in this chain. The problem is that Moody's own testimony (along with the rest of the evidence in the record) failed to fill in Steps 2, 3, and 5. Moody never testified that he knew or cared how much the comparator companies made. In fact, because his day job was in real estate, he knew very little about the industry BRIDGES operated in. He simply claimed that he expected his investment in BRIDGES to be profitable.

Consequently, this part of Tebay's proposed testimony lacked foundation. Connecting his industry-average calculations to Moody's subjective expectations required "a leap of faith." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010). Without Moody's testimony to fill in the missing steps, Tebay's proposed testimony was merely "a plausible hypothesis," and therefore was inadmissible. *Ibid.*

Moody argues that the industry-average calculations were "as specific as" the law "would allow." He points out that expert witnesses in criminal cases "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime." Fed. R. Evid. 704(b). Moody seems to think Rule 704(b) limits expert testimony in criminal cases to general theories, making civil cases like *Daubert*, *Kumho Tire*, and *Tamraz* inapplicable.

Not so. Rule 704(b) does not override Rule 702's requirements of relevance and reliability; it just forbids experts from opining on the ultimate issue of a criminal defendant's mens rea. So, for example, a defense expert in a program-fraud case cannot testify that the defendant "lacked an intent to defraud." *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997). But she can testify that the defendant's billing practices "made it obvious what he was doing." *Ibid.* Similarly, in a money-laundering case, a government expert may testify that "the *effect* of a transaction is to

conceal," but not that "it was done with *an intent to conceal* the true nature and disposition of the funds." *United States v. Warshak*, 631 F.3d 266, 324 (6th Cir. 2010). In both examples, the permissible testimony is still connected to a "particular issue in [the] case." *Kumho Tire*, 526 U.S. at 157. Tebay's calculations were not, so the district court did not abuse its discretion by excluding them.

C

The final subject of Tebay's proposed testimony was "the tax consequences of taking distributions of profits in the form of salary." This, too, was inadmissible, because there was no evidence that these "tax consequences" were the reason for any of the transactions at issue in Moody's trial.

While Moody received some checks labeled as "dividends" from BRIDGES, Morris switched to paying him a salary, even though he was not a BRIDGES employee. This practice "is not proper from a corporate governance or tax perspective," as Moody concedes. In closing, the government went further: It portrayed Moody's "paycheck for a no-show job" as evidence that he knew about Morris's fraud.

Tebay's proposed testimony was meant to rebut this argument. He would have explained that salaries "can be deducted from income on the corporate tax return," and so are only taxed once, while profits distributed as dividends are taxed twice, once as corporate income and once as personal income. Thus, Moody claims, there was "a tax savings motive" for putting him on the BRIDGES payroll, and the arrangement does not imply that he knew about Morris's overbilling.

This argument fails because nothing in the record suggests that these tax considerations were actually the reason Moody received BRIDGES paychecks. This makes the proposed

testimony inadmissible—it would have been "irrelevant, confusing, and perhaps even misleading." *United States v. Kokenis*, 662 F.3d 919, 927 (7th Cir. 2011).

*Kokenis* is quite similar to this case. The defendant owned a business that "explored for oil and natural gas." *Id.* at 922. He misreported some of his profitable sales as liabilities, and he was convicted of filing false income-tax returns. *Id.* at 921–23. "At trial [he] wanted to argue that he had a good-faith belief that he wasn't violating the tax laws." *Id.* at 926. To support this defense, he sought to introduce expert testimony from "a tax accounting professor," who would have explained that "the pool of capital theory" makes it permissible to characterize "certain sales of working interests in oil and gas development projects" in the way the defendant did. *Id.* at 926–27. But the professor "did not offer any opinion that the theory was applicable to any transaction in this case," and the defendant "offered no evidence that he actually relied on the pooling capital theory" in preparing the returns at issue. *Id.* at 927.

The district court excluded the professor's proposed testimony, and the Seventh Circuit affirmed. *Ibid.* It explained that "[o]ffering testimony on a theory in general, without tying it to the case on trial[,] is insufficient." *Ibid.* That is exactly what Moody tried to do here: He offered expert testimony on a general theory of why a shareholder might receive a paycheck instead of a dividend, without tying that theory to the facts of this case. Moody "offered no evidence that he" or anyone at BRIDGES "actually relied on" the double-taxation theory. *Ibid.* Consequently, Tebay's proposed testimony about the theory "was properly excluded." *Ibid.*

### III. Sufficiency of the Evidence

The government needed to prove that Moody knew about the fraudulent origins of the money he accepted. But when he testified at trial, he claimed complete ignorance of the finances of BRIDGES, and neither Morris nor the company's bookkeeper implicated him in the overbilling

and document-forging. Thus, Moody contends, the evidence of knowledge is insufficient to sustain his convictions. We disagree.

In sufficiency-of-the-evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the jury's job, not ours, "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.*

Each of the charged offenses has a knowledge element. Conspiracy requires proof that the defendant "knowingly joined an agreement to commit" a crime. *United States v. Phillips*, 872 F.3d 803, 806 (6th Cir. 2017). The program-fraud statute applies to a defendant who "embezzles, steals, obtains by fraud, or otherwise without authority *knowingly* converts to the use of any person other than the rightful owner" government funds or property. 18 U.S.C. § 666(a)(1)(A) (emphasis added). Money-laundering conspiracy requires proof that the defendant "knowingly and voluntarily joined" the agreement. R. 161 at 2412 (so instructing the jury). The substantive money-laundering offense applies if the defendant engages in certain transactions "knowing that the property involved . . . represents the proceeds of some form of unlawful activity," 18 U.S.C. § 1956(a)(1), while also "knowing that the transaction is designed . . . to conceal or disguise the [unlawful] nature" of the proceeds. *Id.* § 1956(a)(1)(B)(i).

As Moody points out, the government introduced no *direct* evidence that he knew about the overbilling. Moody testified that "Dan Morris . . . r[a]n everything," and he claimed he "had no idea . . . how BRIDGES worked." He specifically denied knowing that BRIDGES was only allowed to bill for its actual costs. Morris testified that he never told Moody what he was up to. Moody did not prepare the inflated invoices and budgets or deal with the county on financial

matters. He was not involved in keeping a second set of books or forging financial records, either; that was Morris and the bookkeeper. And he had no signature authority on the relevant bank accounts. Thus, a reasonable juror could have voted to acquit Moody.

But it does not follow that no reasonable juror could have voted to convict him. "As we have noted in the past, it can be difficult to obtain direct evidence of something so internal as intent to commit fraud." *United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013). Jurors are therefore free to "consider circumstantial evidence and draw reasonable inferences from" it. *Ibid.* Jurors may also "view [a testifying defendant's] demeanor and judge his credibility"; on appeal, "[w]e are loath to override their conclusion." *United States v. Davis*, 490 F.3d 541, 550 (6th Cir. 2007).

"[A]fter viewing the evidence in the light most favorable to the prosecution," a reasonable juror could have found sufficient evidence of Moody's knowledge. *Jackson*, 443 U.S. at 319. First, Moody received large sums of money, unrelated to BRIDGES business but straight out of BRIDGES bank accounts, for years. He and his wife received paychecks, even though, as he later testified, neither of them worked at BRIDGES. His real-estate company also received payments, even though it had no business relationship with BRIDGES. And he received money for a vacation and an investment property, even though these expenses were unmistakably purely personal. This added up to nearly $560,000—none of it connected to any legitimate, reimbursable business expense.

This alone is sufficient circumstantial evidence that Moody knew about the fraud. *See, e.g.*, *United States v. Dodson*, 817 F.3d 607, 610 (8th Cir. 2016) (holding that evidence of knowledge was sufficient in another program-fraud case where the defendant was not directly involved in the overbilling scheme—in part because he "cashed checks for work he knew he did not do . . . from

an organization he had never worked for"); *United States v. Weaver*, 220 F. App'x 88, 91–92 (3d Cir. 2007) (holding, in a wire-fraud case, that the defendant's receipt of paychecks for a no-show job was sufficient evidence of specific intent to defraud).

Second, Moody continued accepting these payments for four years after the IRS began investigating BRIDGES—without once inquiring into their legitimacy or source. The IRS investigation began in June 2010. On July 28, 2010, Revenue Officer Janet Kimple interviewed Moody. She gave him a letter explaining that BRIDGES was "not making [its] tax deposits." Moody met with the IRS again on October 29, 2010, and Kimple again confronted him about the unpaid payroll taxes. These were significant events for Moody: "The IRS showed up at the door and demanded $1,000,000 on the spot. That got [his] attention. . . . [He] was stunned." And Moody had known since 2001, when he first met Morris and started BRIDGES, that Morris had "had tax problems" in the past. That is why the company was incorporated in Moody's name rather than Morris's. So Moody confronted Morris and hired a lawyer. But he did not stop accepting a salary for a no-show job and reimbursements for personal expenses. He continued cashing BRIDGES checks for another four years, stopping only in December 2014, a few months before BRIDGES lost its TANF contracts and shut down.

A reasonable juror could have inferred from all this that Moody "deliberately ignored a high probability that the money obtained from BRIDGES was procured by fraud." This was enough to "find that he . . . had the required knowledge." R. 161 at 2356–57 (so instructing the jury). *See also United States v. Reeves*, 636 F. App'x 350, 354 (6th Cir. 2016) ("The fact that she neglected to take corrective action upon learning about the fraudulent scheme also provided a reasonable basis to disbelieve her claim that she was ignorant [of] the fraud being perpetrated.").

Third, Moody made false statements to the IRS about his and his wife's roles in BRIDGES, in a way that made their no-show paychecks appear justified. In his July 2010 interview with Kimple, Moody insisted that "he was just a shareholder," and at their second meeting in October 2010, he repeated that "[h]e was just an investor." But he changed his story once the IRS's criminal investigators took over the case. In June 2012, Special Agent Dean Martin interviewed Moody. Moody "said that he worked at BRIDGES, and he was compensated for his services there." He told Martin that his role "was strategic planning and job development . . . he would use his business contacts" to place BRIDGES clients with prospective employers. He also said his wife worked at BRIDGES, performing similar duties. In fact, Moody was not a BRIDGES employee; nor was his wife. As Moody explained at trial, by the time of the events at issue, he was just a passive investor, and his wife was "a homemaker."

A reasonable juror could have inferred from Moody's false statements that he knew about the fraud and "sought to conceal his own wrongful acts." *Davis*, 490 F.3d at 550. *See also Dodson*, 817 F.3d at 610 (holding evidence of knowledge to be sufficient where the defendant, who received paychecks "from an organization he had never worked for[,] . . . lied to an investigator about doing the work," describing in detail "the work he supposedly did").

Fourth, the jury did not have to believe Moody's self-serving claims of ignorance about the contracts and finances of BRIDGES. Moody testified that he was not familiar with the terms of the contracts and had no idea they forbade the payments he accepted. But he also admitted on cross examination that in his real-estate business, he read the contracts for transactions he was involved in, advised his clients to do the same, and that this is what a good businessman would do. Moreover, in the early days of BRIDGES, Moody was responsible for the company's finances. He controlled the corporate checkbook and paid the rent and salaries. The jury had "an opportunity to

view his demeanor and judge his credibility." *Davis*, 490 F.3d at 550. It did not have to credit his story, and it reasonably could have found that he still took an interest in the BRIDGES contracts and budget. After all, he owned 100 percent of the company.

For these four reasons, viewed in the light most favorable to the government, the evidence of knowledge is sufficient to sustain Moody's conviction.

## IV.  Sentence

Finally, Moody argues that the district court miscalculated the Guidelines range, rendering his five-and-a-half-year sentence procedurally unreasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007). The main factor in the Guidelines calculation was the size of the financial loss attributable to Moody. The district court found him responsible for about $3.5 million, the amount diverted by the entire overbilling scheme (including the payments to his co-defendants Hawkins and Bowser). This yielded a Guidelines range of 63 to 78 months in prison. Moody contends that he is only responsible for $550,000, the amount he and his wife personally received (with a few deductions). This would have reduced his Guidelines range to 33 to 41 months.

We see no clear error in the district court's calculation.

## A

In fraud cases, the Sentencing Guidelines provide for various enhancements based on the amount of loss. U.S.S.G. § 2B1.1(b). In calculating the loss, the district court considers the defendant's "relevant conduct," including, "in the case of a jointly undertaken criminal activity" such as a conspiracy, "all acts and omissions of others that were . . . within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (internal numbering omitted).

"[W]hether conduct constitutes 'relevant conduct' under . . . § 1B1.3(a)(1)(B) is reviewed *de novo*, while the underlying factual findings regarding whether that conduct is 'within the scope' of, 'in furtherance' of, and 'reasonably foreseeable' in connection with jointly undertaken criminal activity are reviewed for clear error." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018).

The primary issue in this case is the scope of Moody's jointly undertaken criminal activity. "Significantly, this is not necessarily the same as the scope of the entire conspiracy." *Id.* at 894–95 (cleaned up). After Moody was sentenced but before appellate briefing concluded, *Donadeo* set out six "factors relevant to determining the scope of the criminal activity that a defendant agreed to jointly undertake":

- o The existence of a single scheme,
- o Similarities in modus operandi,
- o Coordination of activities among schemers,
- o Pooling of resources or profits,
- o The defendant's knowledge of the scope of the scheme,
- o The length and degree of the defendant's participation in the scheme.

*Id.* at 895.

Although it was decided after Moody's sentencing, *Donadeo* governs his appeal. *See, e.g.*, *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711 (1974) ("[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."); *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801) (Marshall, C.J.) ("[I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.").

We find it unnecessary to remand for the district court to analyze *Donadeo*'s six factors in the first instance. Neither Moody nor the government requests a limited remand for this purpose.[1] *Compare United States v. Afriyie*, No. 17-2444, 2019 WL 2909164, at \*8 (2d Cir. July 8, 2019) (remanding for recalculation of restitution in light of post-sentencing caselaw, where the defendant requested a remand and the government "consent[ed]"). Also, while *Donadeo* endeavored to "state more clearly what is relevant to determining the scope of the criminal activity that a defendant agreed to jointly undertake," it did not explicitly change the law. 910 F.3d at 895. *Donadeo* acknowledged that "without articulating them, we have frequently relied on" the six factors in previous opinions. *Ibid.*; *see id.* n.5 (collecting cases). Finally, Moody and the government addressed many of the same concepts in their sentencing memoranda and at the sentencing hearing, and the district court's explanation of its Guidelines calculation was clear enough "to allow for meaningful appellate review" under the *Donadeo* framework.[2] *Gall*, 552 U.S. at 50.

B

The first *Donadeo* factor is "the existence of a single scheme." 910 F.3d at 895. This factor supports the district court's finding that Moody is accountable for the entire $3.5 million loss. The overbilling scheme "had a single, unlawful objective—to obtain as much money from [the TANF program] as possible." *Id.* at 896.

The second factor is "similarities in modus operandi." *Id.* at 895. This factor also supports the district court's finding. Moody, Morris, Hawkins, and Bowser "all defrauded [TANF] in the

---

[1] At oral argument, the government opposed a remand, arguing that *Donadeo* clarified the law but did not change it, and that the district court properly applied the relevant Guidelines provisions and addressed many of the same concepts as *Donadeo*. Moody argued that the district court erred with or without *Donadeo*.

[2] Moody argues that the district court failed to explain the basis for its findings regarding the scope of his jointly undertaken criminal activity. A sentencing court always has an "obligation . . . to communicate clearly its rationale for imposing the specific sentence." *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006). But not every case calls for a "lengthy explanation." *Rita v. United States*, 551 U.S. 338, 356 (2007). Here, the district court made numerous factual findings on the record, and the transcript of the sentencing hearing makes its rationale clear.

exact same manner[,]" by accepting overbilled funds out of BRIDGES accounts and using the money for personal expenses. *Id.* at 896.

The third factor is "coordination of activities among schemers." *Id.* at 895. This factor supports Moody's argument that he is only accountable for the money he and his wife accepted. There is no evidence of coordination between Moody, Hawkins, and Bowser. All three coordinated with Morris, but not with each other. This contrasts with *Donadeo*, where two of the defendants "jointly established and owned" a shell company, and "once the scheme was discovered, the entire group . . . met . . . to discuss how to respond to the inevitable police investigation." *Id.* at 897.

The fourth factor, "pooling of resources or profits," also supports Moody's argument. *Id.* at 895. There is no evidence that he benefited from Morris's payments to Hawkins and Bowser— unlike in *Donadeo*, where two of the defendants "jointly established and owned" a shell company, deposited embezzled money in a shared bank account, and used the shared account "to fund check and debit card purchases." *Id.* at 897.

The fifth factor is Moody's "knowledge of the scope of the scheme." *Id.* at 895. While there is no direct evidence that Moody knew about Morris's payments to others, the district court pointed to significant circumstantial evidence at the sentencing hearing. It noted that:

- o "Mr. Moody is a businessman . . . who deals with contracts and who was a self-proclaimed entrepreneur."
- o Moody "invested $50,000 as seed money for BRIDGES after meeting with [Morris], whom he knew to have had . . . prior problems with the IRS."
- o "As a sole shareholder, he should have been aware of annual meetings and a board of directors, but there were no meetings and there was no board."

For these reasons, the district court found that Moody knew "or should have . . . known" about the full extent of Morris's overbilling: "You had to know money was being hidden from Job and Family Services . . . certainly the money that you took and that Morris took, and . . . you should

have known other monies were being taken as well." This may not have been the only possible finding, but circumstantial evidence in the record supports it.

The sixth factor is the "length and degree of the defendant's participation in the scheme." *Donadeo*, 910 F.3d at 895. This factor also supports the district court's finding. Moody participated in the scheme from 2006 to 2014, longer than Hawkins (2010–2014) and Bowser (2010–2015). And, like the defendant in *Donadeo*, Moody "played a 'middle of the tier' role in the scheme." *Id.* at 898. As the district court noted, Moody was "an owner—the sole owner—and the only person who collected so-called dividends." Hawkins and Bowser, on the other hand, "had more limited roles in the company."

In sum, the *Donadeo* factors lend sufficient (though not unequivocal) support to the district court's finding that Moody was responsible for $3.5 million in losses. We acknowledge that this case does not involve a classic hub-and-spoke conspiracy, in which "concerted action was contemplated and invited" and each participant "knew that cooperation was essential to successful operation of the plan." *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939). The district court could reasonably have relied on the lack of coordination and sharing of resources and profits to hold Moody responsible for only the money he accepted. *See* U.S.S.G. § 1B1.3, comment. (n.4(C)(vi)). But "to be clearly erroneous . . . a decision must strike us as more than just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990) (cleaned up). The district court's finding regarding the scope of Moody's jointly undertaken criminal activity does not rise to this level.

C

Finally, Moody points out a factual error in the district court's explanation of his sentence. After BRIDGES shut down, Moody tried to start a new company to bid on more TANF contracts. The district court stated that Moody "attempted to form . . . another company with Morris." In fact, there is no evidence in the record that Morris was involved in Moody's effort. "[S]electing a sentence based on clearly erroneous facts" is a "significant procedural error." *Gall*, 552 U.S. at 51. Here, however, our review of the sentencing transcript gives no inkling that Moody's post-BRIDGES activities were the basis for the district court's choice of sentence. Instead, the court appears to have made an isolated mistake about a collateral matter while summarizing the trial evidence.

V.  Conclusion

For these reasons, we **AFFIRM** Moody's conviction and sentence.